IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

EDUARDO LATORRES,

                      Plaintiff,         Civil Action No.
-v.-                              9:09-CV-0532 (FJS/DEP)

DONALD SELSKY and CRAIG GUMMERSON,

                    Defendants.

APPEARANCES:

FOR PLAINTIFF:

EDUARDO LATORRES, *Pro Se*
91-A-4915
Sing Sing Correctional Facility
354 Hunter Street
Ossining, NY  10562-5498

FOR DEFENDANTS:

HON. ANDREW M. CUOMO      CHARLES J. QUACKENBUSH, ESQ.
Attorney General of             Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
U.S. Magistrate Judge

REPORT AND RECOMMENDATION

    Plaintiff Eduardo Latorres, a New York State prison inmate who is

proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights.  In his complaint, plaintiff maintains that during the course of a disciplinary proceeding resulting in a finding of guilt and a sentence of an extended period of disciplinary confinement – a determination which was later annulled as a result of a state court challenge by the plaintiff – he was denied procedural due process.  Plaintiff seeks significant monetary damages as relief for the alleged constitutional violation.

In response to plaintiff's complaint defendants have moved for dismissal on the grounds that the court lacks subject matter jurisdiction over his claims, the complaint fails to state a claim upon which relief may be granted, and plaintiff's claim is precluded by the doctrine of qualified immunity.  Having considered defendants' motion and plaintiff's arguments in opposition, I recommend that the motion be denied in all respects.

I.     BACKGROUND[1]

_____

        [1]        The following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).  Portions of the background description which follows have been derived from the exhibits attached to plaintiff's

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to the claims set forth in his complaint, plaintiff was designated to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *Id.*

On June 6, 2006 an inmate at Auburn was assaulted and stabbed with a makeshift metal shank in a recreation yard occupied at the time by approximately three hundred and ten inmates. Complaint (Dkt. No. 1) § II(D)(1); *see also* Decision/Order/Judgment in *Latorres v. Selsky, et al.,* Index No. 8762-06, dated September 27, 2007 ("Art. 78 Decision") at pp. 1-2. As a result of that incident, in which plaintiff was accused of having participated, he was issued a misbehavior report charging him with violating prison disciplinary rules, including Rules 104.11 (violent conduct),

---

complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). In view of the present procedural posture of the case I have not considered the materials submitted by the defendants with their motion, with the exception of the state court's Article 78 determination referenced later in this opinion, of which this court may properly take judicial notice. *See* Federal Rules of Evidence 201 and 1005; *see also*, *Wilson v. Limited Brands, Inc.,* 08 CV 3431, 2009 WL 1069165 at *1 n. 1 (S.D.N.Y. April 17, 2009); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir.1998)(citations omitted); *Anderson v. Coughlin*, 700 F.2d 37, 44 n. 5 (2d Cir. 1983).

100.10 (assault on an inmate), and 113.10 (possession of a weapon).

Complaint (Dkt. No. 1) §§ II(B), (D) ¶ 2.

A Tier III disciplinary hearing was conducted to address the charges

against Latorres, beginning on June 11, 2006, with Corrections Captain

Craig Gummerson presiding as the hearing officer.[2]  *Id.* § II(D), ¶¶ 3, 4.  At

the close of the hearing plaintiff was found guilty on all charges, and a

penalty, including thirty-six months of disciplinary SHU confinement, with a

corresponding loss of packages, commissary and telephone privileges,

was imposed.  *Id.*

On August 23, 2006 the hearing officer's decision was upheld on

appeal to defendant Donald Selsky, the DOCS Director of Special

Housing and Inmate Discipline.  Complaint (Dkt. No. 1) § II(D), ¶ 8.  The

determination was later annulled, however, by decision issued by Acting

Supreme Court Justice Kimberly A. O'Connor on September 27, 2007, as

result of plaintiff's challenge brought pursuant to Article 78 of the New

---

[2]        The DOCS conducts three types of inmate disciplinary hearings.  Tier I
hearings address the least serious infractions, and can result in minor punishments
such as the loss of recreation privileges.  Tier II hearings involve more serious
infractions, and can result in penalties which include confinement for a period of time
in the Special Housing Unit ("SHU").  Tier III hearings concern the most serious
violations, and could result in unlimited SHU confinement and the loss of "good time"
credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S.
907, 119 S.Ct. 246 (1998).

York Civil Practice Law and Rules.  *Id.* § 2(D), ¶ 14; *see also* Art. 78

Decision.  Plaintiff was subsequently released from the SHU at Auburn in

November of 2008, after serving seventeen months of disciplinary

confinement.  *Id.* §§ 2(D), ¶¶ 14, 15.

Following the close of his disciplinary hearing, plaintiff learned that

another inmate was accused of the same assault and issued a

misbehavior report also alleging violations of various disciplinary rules

stemming from the incident.  Complaint (Dkt. No. 1) § II(D), ¶ 5.  A hearing

was conducted with regard to the charges against that individual, with

defendant Gummerson also presiding as the hearing officer, resulting in

dismissal of the charges based upon the victim's refusal to testify.  *Id.* §

II(D), ¶¶ 5, 6.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on March 23, 2009.[3]  Dkt. No. 1.

Named as defendants in plaintiff's complaint are Donald Selsky and Craig

Gummerson.  Plaintiff's complaint asserts a single cause of action for

deprivation of procedural due process, and seeks both declaratory and

---

[3]      This lawsuit was commenced by the plaintiff in the Western District of
New York, but was later transferred by that court to this district on April 21, 2009.  *See*
Dkt. Nos. 1, 5.

monetary relief.  *Id.*

On August 11, 2009, in lieu of answering plaintiff's complaint, defendants instead moved for dismissal of the complaint for lack of subject matter jurisdiction and failure to state a cause of action upon which relief may be granted, pursuant to Rules 12(b)(1) and 12(b)(6), respectively, of the Federal Rules of Civil Procedure.  Dkt. No. 15.  In their motion, defendants also assert that they are shielded from liability on the basis of qualified immunity.  *Id.*  Plaintiff has since responded in opposition to defendants' motion by the filing of a memorandum.  Dkt. No. 16.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

    A.   Standard of Review

Defendants' motion is brought pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Motions to dismiss under Rule 12(b)(6) are reviewed against the backdrop of the familiar principles

outlined below.  Motions brought under Rule 12(b)(1) are analyzed under that same standard.  *See Coveal v. Consumer Home Mortgage, Inc.,* No. 04-CV-4755, 2005 WL 2708388, at *2 (E.D.N.Y. Oct. 21, 2005) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir.), *cert. denied*, 540 U.S. 1012, 124 S.Ct. 532 (2003)).[4]

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007)).  The relevant pleading requirements are set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its mandates, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal

---

[4]     Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action.  *Erickson v. Pardus*, 551 U.S. at 94, 127 S.Ct. at 2200 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v.*

*Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v.*

*Goord*, 314 F. Supp.2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).  In the event

of a perceived deficiency in a *pro se* plaintiff's complaint, a court should

not dismiss without granting leave to amend at least once if there is any

indication that a valid claim might be stated.  *Branum v. Clark*, 927 F.2d

698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend

"shall be freely given when justice so requires").

    B.    <u>Subject Matter Jurisdiction</u>

      The basis for the portion of defendants' motion seeking dismissal for

lack of subject matter jurisdiction is unclear.  Plaintiff's complaint asserts a

cause of action under 42 U.S.C. § 1983.  As such, the court is vested with

jurisdiction over that claim pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

*Greene v. Hawes*, 913 F. Supp. 136, 141 (N.D.N.Y. 1996) ("Federal court

jurisdiction to hear Section 1983 suits . . . [exists] . . . under the general

federal jurisdiction statute.").

      Without citing any authority suggesting the court retains such

discretion, defendants nonetheless urge the court to opt against

exercising jurisdiction over plaintiff's claims.  Being unaware of any legal

authority for a federal district court to decline to exercise jurisdiction over a

properly asserted claim under 42 U.S.C. § 1983, I recommend that the portion of defendants' motion seeking dismissal for lack of subject matter jurisdiction be denied.

    C.   <u>Sufficiency Of Plaintiff's Allegations</u>

In his complaint, plaintiff alleges that during the course of the disciplinary proceedings against him and ensuing administrative appeal, he was denied procedural due process.  Defendants challenge the sufficiency of plaintiff's due process cause of action.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 260 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658; *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  In their motion, defendants seemingly acknowledge that plaintiff's disciplinary confinement in SHU for seventeen months represents a constitutionally significant deprivation of a liberty interest sufficient to trigger the due process requirements of the Fourteenth Amendment.  *See Colon v. Howard*, 215 F.3d 227, 231-32 (2d

Cir. 2000). Defendants argue, however, that the record now before the court, though limited, supports a finding as a matter of law that the plaintiff received the requisite, constitutionally mandated level of procedural safeguards in connection with that deprivation.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell*, 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974).  Under *Wolff*, the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense.  *Wolff*, 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also Eng v. Coughlin*, 858 F.2d 889, 897-98 (2d Cir. 1988).  In order to pass muster under the Fourteenth Amendment, hearing officer's disciplinary determination must garner the support of at least "some evidence".  *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768

11

(1985).

In his complaint, and as is more fully detailed in a letter attached thereto dated October 27, 2006, from James M. Brogan, Esq., an attorney with Prisoners Legal Services of New York, to defendant Selsky, plaintiff claims that 1) during the course of the disciplinary hearing he was denied the opportunity to present documentary evidence; 2) the finding of guilt is not supported by the record, and is thus arbitrary and capricious; and 3) the assigned hearing officer, defendant Gummerson, was biased.  These allegations suffice to state a cognizable procedural due process cause of action.  *See Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (*quoting*, *inter alia*, *Luna v. Pico*, 356 F.3d 356, 490 (2d Cir. 2004)); *see also Davidson v. Capuano*, No. 78 Civ. 5724, 1988 WL 68189, at *8 (S.D.N.Y. June 16, 1988), *aff'd,* 895 F.2d 1410 (2d Cir. 1989)(citing *McCann v. Coughlin*, 698 F.2d 112, 122 (2d Cir. 1983)).

The related Article 78 determination of Acting Justice O'Connor similarly supports plaintiff's assertion that he has pleaded a plausible claim for deprivation of procedural due process.  Found by Judge O'Connor to be particularly "problematic" was the fact that even though prior to the hearing plaintiff made a written request for a copy of the

Unusual Incident Report filed regarding the inmate stabbing, he was never provided with a copy of the updated report, which would have alerted him to the identification of two other inmate participants in the assault. *See* Art. 78 Dec. at p. 6. In Judge O'Connor's view, had that evidence been available to the plaintiff and presented at the hearing, the outcome could have been different. *Id.*

This case is at a formative stage, at which the court is tasked only with determining whether plaintiff has set forth a plausible due process claim. Finding that his complaint does surpass this modest hurdle, I recommend that defendants' dismissal motion be denied.

 D. <u>Qualified Immunity</u>

In their motion, defendants also assert entitlement to qualified immunity from suit as a further basis for dismissal of plaintiff's claims against them. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to

qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law."  *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996));  *see also Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007);  *Iqbal v. Hasty*, 490 F.3d 143,152 (2d Cir. 2007), *rev'd on other grounds Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937 (May 18, 2009).  The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions.  *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001);  *Warren*, 196 F.3d at 332.  As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (internal quotations omitted) (citing, *inter alia*, *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir. 1972)).

14

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211-12 (2d Cir. 2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id.*; *Gilles v. Repicky*, 511 F.3d 239, 243-44 (2d Cir. 2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard*, 282 F.3d 123, 132-33 (2d Cir. 2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right that was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay*, 323 F.3d at 211; *Poe*, 282 F.3d at 133 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting, in turn, *Salim*, 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to reconsider the analysis prescribed by *Saucier*, holding that while the

sequence of the inquiry set forth in that case is often appropriate, it should no longer be regarded as compulsory.  *Pearson v. Callahan*, 555 U.S. ___, 129 S.Ct. 808, 2009 WL 128768, at *9 (Jan. 21, 2009).  In *Pearson*, the Court reasoned that while the *Saucier* protocol promotes the development of constitutional precedent and is "especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable," the rigidity of the rule comes with a price.  *Id.* at *10.  The inquiry often wastes both scarce judicial and party resources on challenging questions that have no bearing on the outcome of the case.  *Id.*  Given that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Court opined that the algorithm prescribed by *Saucier* may serve to defeat this goal by requiring the parties "to endure additional burdens of suit – such as the cost of litigating constitutional questions and delays attributable to resolving them – when the suit otherwise could be disposed of more readily."  *Id*. (quotations and citations omitted).

As a result of its reflection on the matter, the *Pearson* Court concluded that because the judges of the district courts and courts of appeals "are in the best position to determine the order of decisionmaking

[that] will best facilitate the fair and efficient disposition of each case",
those decision makers "should be permitted to exercise their sound
discretion in deciding which of the . . .  prongs of the qualified immunity
analysis should be addressed first in light of the circumstances of the
particular case at hand."  *Id.* at *9.  In other words, as recently
emphasized by the Second Circuit, the courts "are no longer *required* to
make a 'threshold inquiry' as to the violation of a constitutional right in a
qualified immunity context, but we are free to do so."  *Kelsey v. County of
Schoharie*, 567 F.3d 54, ___, 2009 WL 1424206, at *6 (2d Cir. May 22,
2009) (citing *Pearson*, 129 S.Ct. at 821) (emphasis in original).  "The
[*Saucier* two-step] inquiry is said to be appropriate in those cases where
'discussion of why the relevant facts do not violate clearly established law
may make it apparent that in fact the relevant facts do not make out a
constitutional violation at all.'"  *Id.* (quoting *Pearson*, 129 S.Ct. at 818).

In this instance the right of an inmate to procedural due process in
connection with prison disciplinary hearings, as well as its corresponding
mandates, were well established at the relevant times.  The question of
whether defendants abridged those clearly established rights but
reasonably believed that their actions were lawful is inextricably

17

intertwined with the merits of the case, making the issue of qualified immunity particularly ill-suited for determination at this early procedural juncture.  Accordingly, I recommend that defendants' motion to dismiss plaintiff's claims against them on the basis of qualified immunity be denied, with leave to renew the argument at a time when it can be analyzed based upon a more robust, fully-developed record.

IV.    SUMMARY AND RECOMMENDATION

Defendants' pending motion asserts three grounds for dismissal of plaintiff's claims against them, including lack of subject matter jurisdiction, failure to state a cause of action, and qualified immunity.  Finding that plaintiff has properly invoked the court's subject matter jurisdiction by asserting a claim under 42 U.S.C. § 1983, I recommend denial of that portion of defendants' motion.  Similarly, having concluded at this early stage in the proceedings that plaintiff has set forth a plausible procedural due process claim in his complaint, I recommend denial of defendants' motion to dismiss under Rule 12(b)(6).  Finally, because additional facts must be developed before the court can determine whether a reasonable person in defendants' position would have known that plaintiff's clearly established due process rights were violated by their conduct, I

recommend denial of defendants' motion for dismissal on the basis of qualified immunity, without prejudice.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss plaintiff's complaint (Dkt. No. 15) be DENIED, without prejudice to defendants' right to re-assert qualified immunity as a defense at a later stage in the action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is further hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     January 11, 2010
           Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

19



Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Adrella E. WILSON, Plaintiff,
v.
LIMITED BRANDS, INC., et al., Defendants.
**No. 08 CV 3431(LAP).**

April 17, 2009.

West KeySummary
**Administrative Law and Procedure 15A**       501

15A Administrative Law and Procedure
    15AIV Powers and Proceedings of Administrative
Agencies, Officers and Agents
        15AIV(D) Hearings and Adjudications
            15Ak501 k. Res Judicata. Most Cited Cases

**Civil Rights 78**       1711

78 Civil Rights
    78V State and Local Remedies
        78k1705 State or Local Administrative Agencies
and Proceedings
            78k1711 k. Hearing, Determination, and Relief;
Costs and Fees. Most Cited Cases

**Civil Rights 78**       1712

78 Civil Rights
    78V State and Local Remedies
        78k1705 State or Local Administrative Agencies
and Proceedings
            78k1712 k. Judicial Review and Enforcement of
Administrative Decisions. Most Cited Cases

**Constitutional Law 92**       4178

92 Constitutional Law
    92XXVII Due Process
        92XXVII(G) Particular Issues and Applications
            92XXVII(G)7 Labor, Employment, and Public
Officials
                92k4176 Regulation of Employment
                92k4178 k. Employment Discrimination
Laws. Most Cited Cases
An Article 78 proceeding that affirmed the New York
State Division of Human Rights' (SDHR) determination
that there was no probable cause that an employer engaged
in unlawful discriminatory practices provided a former
employee with a full and fair opportunity to litigate her
claims, which she asserted in the instant federal action as
well. Thus, SDHR's determination of no probable cause
was entitled to preclusive effect because the SDHR's
procedure for investigating complaints, coupled with
judicial review, comported with due process. That the
employee might have been unaware of an administrative
appeal process was of no import. The employee's failure
to avail herself of the full range of available procedures
did not render those procedures inadequate under the Due
Process Clause. U.S.C.A. Const.Amend. 14; McKinney's
CPLR 7801 et seq.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge.

**\*1** Defendants Victoria Secret Stores, L.L.C. and Limited
Brands, Inc. ("VSS" or "Defendants") move pursuant to
Rule 12(c) for judgment on the pleadings, arguing that
collateral estoppel precludes Plaintiff Adrella E. Wilson
from re-litigating claims she has already litigated in the
State Division of Human Rights ("SDHR") and through an
Article 78 proceeding in Bronx County. For the reasons
set out below, the motion is granted.

The Supreme Court has held that a federal court "must
give to a state-court judgment the same preclusive effect
as would be given that judgment under the law of the State

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). In adherence to this rule, the Court of Appeals has previously held that a "New York state court affirmation of the [SDHR's] finding of no probable cause would preclude federal litigation based on the same facts." *Yan Yam Koo v. Dep't of Bldgs. of the City of New York,* 218 Fed. Appx. 97, 98 (2007) (Summary Order), affirming *Yan Yam Koo v. NYC Dep't of Bldgs.,* No. 04 Civ. 9628, 2006 WL 963883 (S.D.N.Y. Apr. 12, 2006) (Summary Order). Therefore, a "judgment pursuant to Article 78 may preclude relitigation of issues already decided in that earlier judgment." *LaFleur v. Whitman,* 300 F.3d 256, 272 (2d Cir.2002).

New York law applies collateral estoppel "if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *LaFleur,* 300 F.3d at 271. In *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982), the Supreme Court held that an Article 78 proceeding that affirmed the SDHR's determination of no probable cause was entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comported with due process. 456 U.S. at 483-485. *See Hill v. Coca Cola Bottling Co. of New York,* 786 F.2d 550, 552 (2d Cir.1986) ("Since [plaintiff's] administrative proceeding before the state labor department was judicially confirmed in the Article 78 proceeding, we are required by *Kremer* to apply New York's law on collateral estoppel.").

Here, Plaintiff filed a Verified Complaint with the SDHR on April 25, 2005. [FN1] Following the SDHR finding of no probable cause on October 10, 2007 (Ex. I to the Amended Complaint ("Am.Compl.")), Plaintiff commenced an Article 78 proceeding seeking "to overturn [the] decision of the [SDHR] as well as investigate ministerial acts which delayed this case for 31 months." (Verified Petition, attached to the Article 78 Decision.) As noted in the Article 78 Decision, a hearing was held in that proceeding on May 19, 2008 at which both parties presented evidence.

FN1. The entire administrative record from the

SDHR is attached to the June 27, 2008 Decision in *Wilson v. Victoria's Secret, et al* Supreme Court of the State of New York, County of Bronx, Index No. 34095707 (the "Article 78 Decision") which, in turn, is attached as Exhibit A to Defendants' moving papers. The Court may consider these papers and the documents attached to the Amended Complaint herein on this motion. *See Stewart v. Transp. Workers Union of Greater New York, Local 100,* 561 F.Supp.2d 429, 435-36 (S.D.N.Y.2008) (noting that a district court may rely on matters of public record of which the court may take judicial notice in resolving a Rule 12(c) motion); *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006) (district court may rely on documents incorporated in a complaint on a Rule 12(c) motion).

On June 27, 2008, the State Court determined that "based upon the hearing held on May 19, 2008 and review of the file of the New York State Division of Human Rights the court finds that the determination of respondent of October 10, 2007 was not arbitrary or capricious." Accordingly, the State Court dismissed Plaintiff's Article 78 petition.

**\*2** The Amended Complaint was filed in this Court on July 25, 2008, and this motion followed.

*Same Issues Raised*

Plaintiff claims national origin discrimination in both the SDHR and in her Amended Complaint in this Court. Plaintiff admits that the claims raised in both fora were claims of national origin discrimination raised under Title VII:

Plaintiff "agrees that she filed a Verified Complaint against Victorias Secret [sic] ('VSS') with the New York State Division of Human Rights ('SDHR') ... and agrees that the charge was based on National Origin." *See* Pl. Opposition at 10.[FN2] The charge filed with the SDHR alleged a violation of both state law and Title VII. *See* Pl. Opposition, at 15; Amended Complaint, Exh. I. The

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

SDHR determined that there was "no probable cause to believe that [VSS] has engaged in or is engaging in the unlawful discriminatory practice complained of." *See* Am. Compl., Exh. I.

> FN2. Reference is to Plaintiff's Affirmation in Opposition to Motion dated February 11, 2009.

Plaintiff "agrees that on December 5, 2007 an Article 78 [proceeding] was filed in the Bronx County New York State Supreme Court ... to overturn the decision of the SDHR." *See* Pl. Opposition at 15. That Court held that "the SDHR actions/determination was not arbitrary and capricious and dismissed the Article 78 petition." *Id.* at 17.

Finally, Plaintiff "agrees that an amended complaint was filed on July 25, 2008 in this [federal] court based on national origin discrimination in violation of Title VII." *Id.* at 19.

More specifically, a comparison of Plaintiff's pleadings in the Article 78 proceeding and in this action confirms that the two claims are based on precisely the same facts and circumstances. For example, in both fora, Plaintiff complains of:

Harassment by management by their cutting her hours and putting false write ups in her personnel files, *compare* letter of 1/3/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 9, p. 5, ll. 1-4.

Unfair or "un-American" working conditions, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) with Am. Compl., ¶ 2E, p. 2 l. 8.

Transfer of sales to favored associates, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 3, l. 16.

Management's failure to inform her of late night cab reimbursement policy, *compare* letter of 3/5/07 to SDHR

(attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p.4, ll. 8-10.

Management's refusal to grant her time off to attend a funeral, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 1-2.

Retaliation for reporting sexual harassment, *compare* letter of 3/5/07 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 6, ll. 6-7, ll. 15-16.

Management's insulting remarks, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl ., ¶ 2E, p. 3, l. 9.

**\*3** Retaliation of the April 13, 2005 incident which led to her termination, *compare* letter received 10/4/06 to SDHR (attached to Article 78 Decision) *with* Am. Compl., ¶ 2E, p. 8, l. 1.

The issues raised in the SDHR proceeding were, of course, necessarily decided by the State Court in the Article 78 Decision.

*Full Opportunity to Litigate Had*

A "full and fair opportunity to litigate" means that "state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause." *Kremer, 456 U.S. at 481.* As noted above, the Supreme Court has clearly stated that an Article 78 proceeding that affirms the SDHR's determination of no probable cause is entitled to preclusive effect because the SDHR's procedure for investigating complaints, coupled with judicial review, comport with due process. *Id. at 483-485.* Thus, the Article 78 proceeding here provided Plaintiff with a full and fair opportunity to litigate her claims. That she might have been unaware of the administrative appeal process, *see* Pl. Op. at 5-6, is of no import. Plaintiff's failure to avail herself of the full range of available procedures does not render those procedures inadequate under the Due Process Clause. *Kremer, 456 U.S. at 485.* ("The fact that Mr. Kremer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

failed to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy.")

*Plaintiff's Other Arguments Against Collateral Estoppel Without Merit*

To the extent that Plaintiff suggests that her naming VSS in her SDHR proceeding and Limited Brands in this action somehow avoids the application of collateral estoppel, she is mistaken. Identity of defendants is not required. *See, e.g.,* LaFleur, 300 F.3d at 274 (holding that the proper inquiry with respect to collateral estoppel is *"not* whether the respondent-defendants were identical in both cases"); Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 555, n. 1 (2d Cir.1967) (explaining that "collateral estoppel may bar relitigation of an issue even against different defendants," provided that the issue in contention was necessary to the result reached in the prior proceeding); Yan Yam Koo, 218 Fed. Appx. at 99 (holding that the fact "[t]hat the plaintiff did not name the identical parties in the state and federal actions does not disturb our finding of [issue] preclusiveness").

In any event, the party defendants are sufficiently closely related to permit preclusion. Victoria's Secret Stores, L.L.C.-Plaintiff's actual employer (*see* Am. Compl. at ¶ 11E)-is a wholly-owned subsidiary of Limited Brands Store Operations, Inc., a Delaware corporation that is a wholly-owned subsidiary of Intimate Brands, Inc. Intimate Brands, Inc. is a Delaware corporation that is a wholly-owned subsidiary of LBI, which is also a publicly traded Delaware corporation.[FN3]

> [FN3.] The Court may take judicial notice of this fact, as this information is attached to the LBI Form 10K that is filed with the Securities and Exchange Commission. Accordingly, it is a matter of public record. *See* Stewart, 561 F.Supp.2d at 435-36.

Finally, to the extent that Plaintiff argues that she did not raise all her federal causes of action in her Article 78 proceeding, she is nevertheless barred from raising them now pursuant to the doctrine of *res judicata.*[FN4] Under New York law, the doctrine of *res judicata* bars a "later

claim arising out of the same factual grouping as an earlier litigated claim even if the later claim is based on different legal theories or seeks dissimilar or additional relief." Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994). Because Plaintiff's claims indisputably arise from the same set of facts, *res judicata* applies to bar any legal theories she now raises that are different from those raised in the state court proceeding. *See Kremer,* 456 at 465 n. 3, 481 n. 22 (noting that *res judicata* has been taken to bar claims arising from the same transaction even if brought under different statutes; also noting that a " 'party cannot escape the requirements of full faith and credit and res judicata by asserting its own failure to raise matters clearly within the scope of a prior proceeding' " (quoting Underwriters Nat'l Assurance Co. v. North Carolina Life & Accident & Health Ins. Guar. Ass'n, 455 U.S. 691, 710, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982))).

> [FN4.] Although Plaintiff named VSS as the defendant in the state court case and LBI in this case, the identity of the parties is nonetheless the same for purposes of determining *res judicata.* LBI has a sufficiently close relationship to VSS and both defendants were known to Plaintiff at the time she filed her first lawsuit. *See, e.g.,* Official Publ'ns, Inc. v. Kable News Co., 811 F.Supp. 143, 147 (S.D.N.Y.1993) (holding that the "doctrine of *res judicata* also bars litigation of the same causes of action against defendants who were known to plaintiff at the time the first action was filed but were not named where the newly-added defendants have a sufficiently close relationship to the original defendant"); Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 270 (2d Cir.1989) (noting that in determining privity for *res judicata* purposes, the issue is one of substance rather than the names of the caption of the case). Because LBI is merely a holding company of which VSS is a wholly-owned subsidiary, and the defenses raised by VSS sufficiently represented LBI's interests, VSS and LBI are in privity for *res judicata* purposes. *See* G & T Terminal Packaging Co. v. Consol. Rail Corp., 719 F.Supp. 153, 159 (S.D.N.Y.1989) (holding that "[s]ubsidiaries are in privity with their principal for res judicata purposes when, as here, they sufficiently represent the principal's interests"). Additionally, the same counsel who represented

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)
(Cite as: 2009 WL 1069165 (S.D.N.Y.))

> VSS in the prior state court litigation represents LBI and VSS in the current litigation. *See Melwani v. Jain,* No. 02 Civ. 1224, 2004 WL 1900356, *2 (S.D.N.Y. Aug. 24, 2004)* (stating that "the fact that the parties in the prior and current litigation had the same attorney is of singular significance in the privity analysis" (quotation marks omitted)).

### *Conclusion*

**\*4** For the reasons set out above, Defendants' motion for judgment on the pleadings [dkt. no. 14] is granted.

The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

S.D.N.Y.,2009.
Wilson v. Limited Brands, Inc.
Not Reported in F.Supp.2d, 2009 WL 1069165 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Deborah COVEAL, Faith Goodman and Arvilla Green,
Plaintiffs,
v.
CONSUMER HOME MORTGAGE, INC., Ideal
Mortgage Bankers, Ltd., d/b/a Lend America U.S.
Mortgage Corp. d/b/a Mortgage Concepts, Michael
Ashley, individually and in his capacity as a substantial
shareholder of Consumer Home Mortgage and Ideal
Mortgage Bankers, Ltd., Subsidiaries of U.S. Mortgage
Corp., The Foreclosure Network of Metro New York,
Inc. d/b/a the Foreclosure Network, Gary Lewis,
individually and in his capacity as substantial
shareholder of the Foreclosure Network of Metro New
York Inc., Kenneth Golden, Esq., Rajesh Maddiwar,
Esq., M & T Mortgage Corp., Charles Salva Appraisals,
Inc., and Charles Salva, Defendants.
No. 04-CV-4755 (ILG).

Oct. 21, 2005.

Howard W. Goldson, Goldson, Nolan Associates, LLP,
Melville, NY, for Plaintiffs.

Richard F. Harrison, Phillips, Nizer, Benjamin, Krim &
Ballon, Garden City, NY, Gregory W. Carman, Jr.,
Carman, Callahan & Ingham, Farmingdale, NY, Kirk
Peter Tzanides, Coffinas & Coffinas LLP, Diane Marie
Nardi, Evelyn H. Seeler, Buchanan Ingersoll, P.C., New
York, NY, Robert Mauer, Garden City, NY, for
Defendants.

*MEMORANDUM AND ORDER*

GLASSER, J.

*INTRODUCTION*

**\*1** Pending before the Court is a motion filed by various
defendants to dismiss the first amended complaint. In a
memorandum and order dated March 29, 2005 (the
"Order"), familiarity with which is assumed, *see* *Coveal v.
Consumer Home Mortgage, Inc.,* 2005 WL 704835
(E.D.N.Y. Mar.29, 2005), the Court granted in part and
denied in part the motion filed by defendants Michael
Ashley ("Ashley"), Kenneth Golden ("Golden"),
Consumer Home Mortgage, Inc. ("CHM"), Ideal
Mortgage Bankers, Ltd. d/b/a Lend America a/k/a U.S.
Mortgage Corp. and Mortgage Concepts (collectively,
"Lend America") and Rajesh Maddiwan ("Maddiwan") to
dismiss the original complaint. The Court dismissed with
prejudice plaintiffs' claim under the Truth-in-Lending Act
("TILA"), 15 U.S.C. § 1601*et.seq.,* because it was
untimely, and dismissed without prejudice plaintiffs' other
federal cause of action, under the Equal Credit
Opportunity Act ("ECOA"), 15 U.S.C. § 1691*et.seq.,* with
leave to replead that claim. In part, the Court held as
follows:

At oral argument, and consistent with the statements in
their opposition papers, plaintiffs argued that they did not
become aware of the ECOA claims until November 10,
2002, when their counsel read a newspaper article about
other similar lawsuits that had been filed in this Court by
African-American home buyers who were allegedly the
subject of a similar predatory lending scheme involving
many of the same defendants. If these allegations are true,
and plaintiffs can assert that they acted with reasonable
diligence in discovering the alleged wrongdoing, it may be
appropriate for the Court to invoke the fraudulent
concealment doctrine to the ECOA claim.

*Coveal,* 2005 WL 704835, at *7*. Pursuant to 28 U.S.C. §
1367(c), the Court denied the motion to dismiss the state
law claims filed under the New York State Deceptive
Practices Act, N.Y. G.B.L. § 349, the New York State
Real Property Law, N.Y. Real. Prop. § 443, and common
law claims for conspiracy to defraud, fraud and breach of
fiduciary duty. *Id.* at ----8-10.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

Plaintiffs filed a first amended complaint (the "amended complaint") on April 18, 2005. The amended complaint asserts the same causes of action as the original complaint except for the now-dismissed TILA claim. In the amended complaint, plaintiffs added a section styled "Fraudulent Concealment" in which they alleged, *interalia,* that in the Spring of 2002, they discussed with the law firm representing them in this case "whether an arrangement could be made with M & T to workout the arrears and reduce the monthly mortgage payments." (Am.Compl.¶ 93). "At that time, Plaintiffs did not have possession or access to the documents which they had signed at the closing." (*Id.* ¶ 94). Plaintiffs made efforts to contact Rajesh Maddiwar, the attorney who represented them with respect to the purchase of the subject property, but he did not return their calls. (*Id.* ¶ 95). Attempts to work out a settlement regarding the mortgage payments that were in arrears were unsuccessful, resulting in M & T instituting a foreclosure proceeding in September 2002. (*Id.* ¶ 96). Plaintiffs did not become aware that they may have been victims of discrimination with respect to the loan transaction until after November 10, 2002, when Newsday "published an article which revealed that persons other than plaintiffs were involved in lawsuits" against some or all of the defendants in this case "in which predatory lending was alleged ." (*Id.* ¶¶ 97, 100). It was only after reading the Newsday article that plaintiffs' counsel conducted an investigation in which they determined that defendants' other purported victims were also African-American. (*Id.* ¶ 98).

**\*2** Ashley, Golden, CHM and Lend America, joined by M & T Mortgage Corp. ("M & T"), have filed this motion pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), arguing that the Court lacks subject matter jurisdiction over this case pursuant to the Rooker-Feldman doctrine because the plaintiffs litigated (or could have litigated) the very same claims in a foreclosure proceeding instituted by M & T in New York Supreme Court, County of Nassau (the "Foreclosure Proceeding"). In that case, Coveal, Goodman and Green filed a verified answer with affirmative defenses and counterclaims against M & T for fraud, fraud in the inducement, intentional infliction of emotional distress and perpetration of an "unconscionable predatory lending scheme." (Declaration of Evelyn H. Seeler executed on June 3, 2005 ("Seeler Decl.") Exh. E ¶¶ 41-56). Further, in their fourth affirmative answer, plaintiffs asserted that M & T and its agents were engaged in "predatory lending" constituting "deceptive practices

under section 349 of the General Business Law of the State of New York." (*Id.* ¶ 15). Moreover, the loan extended to plaintiffs was alleged to be a scheme targeted at "minority purchasers." (*Id.* ¶ 27). The defendants, other than M & T, have also moved to dismiss the ECOA claim, alleging that notwithstanding the additional allegations, the amended complaint does not assert a claim for relief under ECOA.

*DISCUSSION*

I. Standards Governing the Pending Motions

A motion to dismiss for subject matter jurisdiction under Rule 12(b)(1) is reviewed under the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Lerner v. Fleet Bank, N.A.,* 318 F.3d 113, 128 (2d Cir.), cert.denied, 540 U.S. 1012, 124 S.Ct. 532, 157 L.Ed.2d 424 (2003). Specifically, the Court must review the allegations in the light most favorable to plaintiffs, and draw all reasonable inferences in their favor. *Id.* Further, the court may consider evidence beyond the pleadings to resolve disputed issues of fact pertaining to its jurisdiction. *See Flores v. S. Peru Copper Corp.,* 406 F.3d 65, 2003 WL 24049712, at *18 n. 30 (2d Cir. Aug.29, 2003). A court presented with a motion to dismiss under both Fed.R.Civ.P. 12(b)(1) and 12(b)(6) must decide the "jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits, and, therefore, an exercise of jurisdiction." *Magee v. Nassau County Med. Ctr.,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998).

Fed.R.Civ.P. 12(b)(1) directs the district court to dismiss a complaint when it "lacks jurisdiction over the subject matter." Federal subject matter jurisdiction exists when a "federal question" is presented under 28 U.S.C. § 1331, or, as provided in 28 U.S.C. § 1332, where the plaintiffs and all the defendants are of diverse citizenship and the amount in controversy exceeds $75,000. *See Perpetual Securities, Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir.2002). If the exercise of that jurisdiction would result in the reversal or modification of a state court judgment, federal district courts lack subject matter jurisdiction, even if there is a predicate for the exercise of federal jurisdiction. *Davis v. City of New York,* 2000 WL 1877045, at *3 (S.D.N.Y.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

Dec.27, 2000) (citing *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416, 44 S.Ct. 149, 68 L.Ed. 362 (1923)). Where jurisdiction is lacking, the district court must dismiss the complaint notwithstanding the merits. *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1188 (2d Cir.1996). The party seeking to invoke federal jurisdiction carries the burden of proof in establishing that jurisdiction. See*APWU v. Potter,* 343 F.3d 619, 623 (2d Cir.2003).

II. Defendants' Argument that the Court Lacks Subject Matter Jurisdiction

**\*3** In this motion, the moving defendants assert that the Court lacks subject matter jurisdiction pursuant to the judicially created Rooker-Feldman doctrine. The Rooker-Feldman doctrine was initially articulated in *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and its principle subsequently re-affirmed in *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). In sum, the doctrine states that among federal courts, only the United States Supreme Court maintains subject matter jurisdiction to review state court judgments. See*,e.g.,Santini v. Conn. Hazardous Waste Mgmt. Serv.,* 342 F.3d 118, 126 (2d Cir.2003), abrogatedonothergroundsby*,San Remo Hotel, L.P. v. City and County of San Francisco,* --- U.S. ----, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005); *Thaler v. Casella,* 960 F.Supp. 691, 697-98 (S.D.N.Y.1997) (holding that Rooker-Feldman "requires that an aggrieved state court litigant must pursue his claims directly in the state appellate courts and ultimately to the United States Supreme Court."). The Court thus lacks subject matter jurisdiction over this case "if the exercise of jurisdiction would result in the reversal or modification of a state court judgment." *Hachamovitch v. DeBuono,* 159 F.3d 687, 693 (2d Cir.1998). Therefore, if the identical claims raised in a state court proceeding are raised in the subsequent federal proceeding, Rooker-Feldman will bar the action.

The United States Supreme Court confirmed this principle in a decision it decided last term. It limited the application of Rooker-Feldman to the situation where "the losing party in state court filed suit in federal court *after the state proceedings ended,* complaining of an injury caused by the state-court judgment and seeking review and rejection

of that judgment." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* --- U.S. ----, ----, 125 S.Ct. 1517, 1526, 161 L.Ed.2d 454 (2005) (emphasis added). The Supreme Court clarified that "[w]hen there is parallel state and federal litigation, Rooker-Feldman is not triggered simply by the entry of judgment in state court." *Id.* (noting that in this situation, "[c]omity or abstention doctrines may, in various circumstances, permit or require the federal court to stay or dismiss the federal action in favor of the state-court litigation"). The Court further noted that courts often mistakenly apply the Rooker-Feldman doctrine to situations where the holding rests on the affirmative defense of collateral estoppel or res judicata-a decision on the merits-not a finding that the Court lacks subject matter jurisdiction over the action. *Id.*

The moving defendants argue that plaintiffs either did litigate, or had the opportunity to litigate, the same causes of action in the Foreclosure Proceeding as they do in this case. As the Court noted in its prior opinion:

The very same plaintiffs, in a sworn pleading filed in a New York State Court, revealed their knowledge of the underlying events giving rise to this case as far back as 2002. On September 26, 2002, M & T Mortgage filed a lawsuit against plaintiffs seeking foreclosure of the [subject] property based their failure to make the mortgage payments ... In that case, plaintiffs submitted a verified amended answer. That pleading, dated December 17, 2002, which also asserted counterclaims against M & T Mortgage, alleged the very same, or substantially similar, factual allegations which are set forth in the complaint in this case. (Verified Answer, dated December 17, 2002, ¶¶ 23-40).

**\*4***Coveal,* 2005 WL 704835, at \*7.

The pleadings from the Foreclosure Proceeding were not submitted by the parties in their prior motions, but have now been presented to the Court for the first time. An examination of the plaintiffs' answer in that proceeding reveals that they asserted counterclaims for fraud (first counterclaim), fraud in the inducement (second counterclaim), an "illegal, unlawful and unconscionable predatory lending scheme" (third counterclaim) and intentional infliction of emotional distress (fourth

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

counterclaim). (Seeler Decl. Exh. E ¶¶ 41-56). Following the filing of the answer, M & T Mortgage filed a motion pursuant to New York Civil Practice Law and Rules 3212 (the state law equivalent to Fed.R.Civ.P. 56(c)) to, among other things, dismiss the counterclaims. (Seeler Decl. Exh. F). The Supreme Court of Nassau County granted that motion in its entirety and dismissed plaintiffs' counterclaims with prejudice. (Id. Exh. H). There is no suggestion in the record that plaintiffs appealed that judgment. Therefore, there can be no dispute that plaintiffs' claims in the amended complaint as they are alleged against M & T Mortgage for conspiracy to commit fraud (first cause of action), willful fraudulent conduct (third cause of action), and aiding and abetting a "predatory loan," have previously been decided by the state court and thus cannot be relitigated here because the Court lacks subject matter jurisdiction over these causes of action.[FN1]

> FN1. The doctrine of res judicata would bar these claims as well. It precludes parties from relitigating claims that have been adjudicated in a prior action involving the same parties or their privies. Saud v. Bank of New York, 929 F.2d 916, 918 (2d Cir.1991) (quotation and citations omitted). It applies when the following three elements have been satisfied: (1) identity or privity of the parties to the present and prior actions; (2) identity of the causes of action; and (3) a prior judgment on the merits. NLRB v. United Technologies Corp., 706 F.2d 1254, 1259 (2d Cir.1983). In the Foreclosure Proceeding, plaintiffs were parties as well as M & T, thus there is an identity of parties. Further, as discussed above, plaintiffs' claims for conspiracy to commit fraud (first cause of action), willful fraudulent conduct (third cause of action), and aiding and abetting a "predatory loan" (eighth cause of action) were decided in the Foreclosure Proceeding on the merits, and thus cannot be raised here again. This requires dismissal of these causes of action based on res judicata grounds.

"In addition to claims that were actually litigated in state court, the Rooker-Feldman doctrine bars lower federal courts from exercising jurisdiction over claims that are 'inextricably intertwined' with state court determinations."

Kropelnicki v. Siegel, 290 F.3d 118, 128 (2d Cir.2002); Santini, 342 F.3d at 126 (same). The Second Circuit has ruled that "inextricably intertwined" means, at minimum, "that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding ... subsequent litigation of the claim will be barred under the Rooker-Feldman doctrine if it would be barred under the principles of preclusion." Kropelnicki, 290 F.3d at 128 (citing Moccio v. New York State Office of Court Admin., 95 F.3d 195, 199-200 (2d Cir.1996)) (noting that the Rooker-Feldman doctrine is inapplicable only where the claims were never presented in the state court proceedings and the plaintiff did not have an opportunity to present the claims in those proceedings), abrogated on other grounds by, Exxon Mobil Corp., ---U.S. ----, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). These Second Circuit decisions have been abrogated by Exxon Mobil Corp., in which the Supreme Court recently clarified that issue preclusion-collateral estoppel-or claim preclusion-res judicata-does not divest the Court of subject matter jurisdiction under the Rooker-Feldman doctrine, but rather, it is an affirmative defense which may be dispositive to a resolution of the case. [FN2] See Exxon Mobil Corp., 125 S.Ct. at 1526 ("In parallel litigation, a federal court may be bound to recognize the claim- and issue-preclusive effects of a state-court judgment, but federal jurisdiction over an action does not terminate automatically on the entry of judgment in the state court.").

> FN2. Defendants are raising the affirmative defense of collateral estoppel in this motion which they filed in lieu of an answer. Cf. Steinberg v. Columbia Pictures Industries, Inc., 663 F.Supp. 706, 715 (S.D.N.Y.1987) (holding that "absent prejudice to the plaintiff, a defendant may raise an affirmative defense in a motion for summary judgment for the first time.") (quotation omitted).

**5** Under federal law, "a federal court must apply the rules of collateral estoppel of the state in which the prior judgment was rendered." Sullivan v. Gagnier, 225 F.3d 161, 166 (2d Cir.2000) (citations omitted). Under New York law, for an issue to be subject to collateral estoppel, 1) there must be an identity of issue which has necessarily been decided in the prior action and is decisive of the present action; and 2) there must have been a full and fair

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

opportunity to contest the decision now said to be controlling. *Schwartz v. Public Administrator of Bronx,* 24 N.Y.2d 65, 71, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969). Thus, "[c]ollateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Johnson v. Arbitrium (Cayman Islands) Handels AG,* 198 F.3d 342, 346 (2d Cir.1999) (citation and internal quotation marks omitted).

As to the first element-whether the issue in the first litigation was necessarily decided, "it is not necessary that the issue have been 'actually litigated' in the sense that evidence have been offered on the point." *Richardson v. City of New York,* 2004 WL 325631, at *2 (S.D.N.Y. Feb.20, 2004). "New York requires only that the issue have been properly raised by the pleadings or otherwise placed in issue and actually determined in the prior proceeding." *Id.* (internal quotation marks and citation omitted) (emphasis added). In making this determination, the "focus[ ][is] on the rights, questions or facts that underlie a judicial decision; it does not focus on the legal theories underlying the complaint or decision." *Beharry v. M.T.A. New York City Transit Authority,* 1999 WL 151671, at *6 (E.D.N.Y. March 17, 1999), aff'd,242 F.3d 364 (2d Cir.2000), cert.denied,531 U.S. 1041 (2001). "Therefore, subject to certain caveats not relevant here, once a certain set of facts has been determined in a proceeding, those facts cannot be challenged even when a subsequent proceeding attempts to apply a new legal theory to those facts." *Id..*

All of the facts giving rise to the amended complaint were presented to the New York State Court, though plaintiffs did not allege all of the same causes of action in the Foreclosure Proceeding as they do in this case. This difference, however, does not preclude application of the collateral estoppel doctrine, which as discussed above, the Supreme Court has clarified has been mistakenly referred to as the Rooker-Feldman doctrine by courts in the Second Circuit. *Seealso Zipper v. Todd,* 1997 WL 181044, at *3 (S.D.N.Y. Apr.14, 1997) ("While it is true that plaintiffs never actually raised the federal claims of Section 1983, RICO and SLAPP violations before the state court, Rooker-Feldman precludes district court review of claims 'inextricably intertwined' with state court determinations. The fact that plaintiffs raise new claims under federal

statutes does not preclude a finding that they are barred by the Rooker-Feldman doctrine."); *Harris v. New York State Dep't of Health,* 202 F.Supp.2d 143, 166-67 (S.D.N.Y.2002) (barring plaintiff's ADA and Rehabilitation Act claims because they were "integrally connected with the matters decided in the state administrative proceedings" and "implicate[d] the essence of the issue adjudicated by the state court"). Indeed, plaintiffs cannot circumvent application of the collateral estoppel doctrine (expressed by some courts in a discussion of the "Rooker-Feldman" doctrine) by recasting their claims, as they attempt to do through their ECOA cause of action, as a federal civil rights violation. *SeeDavidson v. Garry,* 956 F.Supp. 265, 268-69 (E.D.N.Y.1996), aff'd,112 F.3d 503 (2d Cir.1997); *Drew v. Chase Manhattan Bank, N.A.,* 1998 WL 430549 at *6 (S.D.N.Y. July 30, 1998) (rejecting plaintiff's § 1983 claims that defendants made false representations in court papers as " 'merely a thinly-veiled effort to invalidate [a] State Court foreclosure judgment, in contravention of Rooker-Feldman' "); *Beckford v. Citibank N.A.,* 2000 WL 1585684 at ----2-4 (S.D.N.Y. Oct.24, 2000) (plaintiff's claim that defendants violated federal and state law during foreclosure proceedings in Bronx County Supreme Court barred by Rooker-Feldman doctrine).

**\*6** The fact that plaintiffs' claims in the Foreclosure Proceeding were dismissed in summary fashion is not determinative since collateral estoppel applies to virtually all types of judgments. *See,e.g.,Ackermann v. Doyle,* 43 F.Supp.2d 265, 272 (E.D.N.Y.1999). In addition, as the Supreme Court noted in *Rooker,* even if the state court was wrong, the judgment is an effective and conclusive adjudication until modified or reversed in the appropriate appellate proceeding. *Rooker,* 263 U.S. at 415.

Finally, the fact that all of the defendants other than M & T were not parties to the Foreclosure Proceeding does not bar the use of collateral estoppel. Under non-mutual collateral estoppel, if parties, as plaintiffs here, have had an opportunity to fully and fairly litigate issues and lost, then third parties unrelated to the original action can bar the litigant from relitigating those same issues in a subsequent suit. *See United States v. Ustica,* 847 F.2d 42, 49 n. 14 (2d Cir.1988); *seealso ACLI Government Securities, Inc. v. Rhoades,* 963 F.2d 530, 533 (2d Cir.1992) (citing *Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326-31, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)
(Cite as: 2005 WL 2708388 (E.D.N.Y.))

(the doctrine of mutuality, at least for defensive use of collateral estoppel, no longer applies).

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and Fed.R.Civ.P. 12(b)(6). The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

E.D.N.Y.,2005.
Coveal v. Consumer Home Mortgage, Inc.
Not Reported in F.Supp.2d, 2005 WL 2708388 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Ronald DAVIDSON, Plaintiff,
v.
Clement B. CAPUANO, David R. Harris and Joseph P.
Keenan, Defendants.
**No. 78 CIV. 5724 (RLC).**

June 16, 1988.

OPINION AND ORDER

NINA GERSHON, United States Magistrate:

**\*1** In this civil rights action brought pursuant to 42 U.S.C. § 1983, plaintiff Ronald Davidson (formerly Ronald Finkelstein) alleges that the defendants deprived him of his constitutional right to procedural due process of law in a prison disciplinary proceeding. Specifically, he claims that the hearing officer was not impartial, and that he was not permitted to call witnesses, make an oral statement, or present documentary evidence in his defense. In addition, the requisite written statement detailing the evidence relied on by the hearing officer in determining his guilt is alleged to be inadequate. Davidson seeks damages for the loss of package room and prison account privileges from October 1, 1978 to January 31, 1979 and for the loss of a prison job and of a kosher diet which resulted from his transfer to another institution.

Plaintiff filed his *pro se* complaint in this matter on November 30, 1978. In February of 1983, the case was referred to me for all proceedings and entry of judgment pursuant to 28 U.S.C. § 636(c) and in November of that year I granted plaintiff's request for appointment of counsel. Plaintiff's second amended complaint was filed on October 29, 1984 and he subsequently moved for partial summary judgment on the ground that a prior judgment in his favor in a New York State Article 78

proceeding precluded the defendants from relitigating certain issues of liability. The defendants also moved for summary judgment on numerous grounds, including res judicata on the basis that plaintiff failed to assert the Section 1983 damages claim in the prior state action. On January 31, 1985 I granted summary judgment for defendants, finding that, under New York law, res judicata principles precluded this federal action. The Court of Appeals for the Second Circuit reversed this ruling in *Davidson v. Capuano,* 792 F.2d 275 (2nd Cir.1986) and the case was remanded for further proceedings.

Now before me are the parties' motions for summary judgment on the grounds not previously addressed. The parties were given the opportunity to brief the remaining legal issues in supplemental papers. Both parties also have now submitted statements pursuant to Local Civil Rule 3(g). The plaintiff moves for partial summary judgment on certain liability issues under the principle of collateral estoppel. The defendants move for dismissal of the complaint on several grounds: res judicata arising from a second Section 1983 action previously adjudicated in this Court; absolute and qualified immunity; lack of personal involvement; and absence of merit to the procedural due process claims.

*FACTUAL BACKGROUND*

None of the material facts raised by the parties' motions are in dispute. The disciplinary proceeding at issue in this lawsuit began on September 8, 1978 when a "Misbehavior Report" charging Davidson with fraud in violation of prison regulations was filed by Institution Steward Sunny Schriver and Correctional Officer K. Keane. Briefly summarized, the report alleges that on or about May 18, 1978 plaintiff placed an order for merchandise with the J.C. Penny department store under the name Reverend Ronald Finkelstein and that in July he notified the store and the institution that he, in fact, did not order any merchandise and that someone else had placed the order and charged it to his account. The report discounted this denial by Davidson by stating that he had exhibited knowledge of the order that only the person who placed it could possess and that he had a prior history of improperly using the title "Reverend" in making purchases. The report

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

also noted that plaintiff had solicited and received a refund from the store which was credited to his inmate account on August 4, 1978. Davidson was accused of seeking additional refunds by submitting a claim to the prison and by writing a letter to the store on August 21, 1978 claiming that he had not received the reimbursement.

Davidson was served with a copy of the "Misbehavior Report" on September 8, 1978 and was brought, on September 11, 1978, before the prison Adjustment Committee. The Committee determined that the charges required a Superintendent's Proceeding. On September 13, 1978, defendant Harris, then the Superintendent of the Green Haven facility, appointed defendant Deputy Superintendent Capuano to conduct the hearing. Three days later, a "Formal Charge" was served on Davidson which reiterated the substance of the fraud accusations set out in the Misbehavior Report.

**\*2** Pursuant to New York State prison regulations governing prison disciplinary proceedings (See 7 N.Y.C.P.R. § 253, *et seq.*), plaintiff was permitted to select a member of the prison staff to assist him in preparing a defense to the charge. The regulations required the assistant to investigate any reasonable factual claim the inmate could make in his defense and to submit a written report to the hearing officer, including any documentary evidence and the statements of witnesses that the inmate requested be interviewed. Plaintiff selected Correctional Counselor Hutchinson to assist him. Hutchinson submitted a preliminary report to defendant Deputy Superintendent Keenan on September 21, 1978. The report noted requests by Davidson that certain witnesses be interviewed and that samples of his signature be compared with the merchandise order form at issue. Under the heading "Inmate's Explanation or Statement About Charges", Hutchinson referred Keenan to a two page document written by Davidson and entitled "Statement of Events Leading to Administrative Charges Against Me and the Superintendent's Proceeding".

The Superintendent's Proceeding was convened on September 24, 1978 before defendant Keenan. He read the charges to plaintiff and asked him, "What do you say?". Plaintiff responded, "Not guilty", and asked to make a statement. Keenan told him, "Not at this time", and adjourned the hearing. Keenan then instructed Hutchinson

to take the statements of the three witnesses that Davidson had designated. Hutchinson took statements from two of the witnesses, an inmate named Conroy and a guard named Boluanger who worked in the package room. The third witness, Officer Gilroy, who also worked in the package room, was not interviewed. Hutchinson stated in his September 28, 1978 report that Gilroy's statement was unnecessary because the only information Gilroy could provide, regarding packages received by Davidson, would come from the same records that Boluanger examined and reported on.

On September 29, 1978, Capuano assumed his role as hearing officer for the Superintendent's Proceeding. Prior to the actual hearing he interviewed Schriver and Keane, the authors of the initial Misbehavior Report. According to an affidavit submitted by Capuano on the motion for summary judgment, he also reviewed the hearing file, which included the misbehavior report, the statements of the witnesses that Davidson had designated and plaintiff's two page written statement concerning the charges. (Capuano Afft. ¶ 6(h)). The Superintendent's Proceeding was reopened on October 7, 1978.[FN1] When the hearing began, Capuano read the accusations from the Formal Charge and then stated, "On the first hearing you pleaded not guilty. I have since interviewed the individuals initiating the misbehavior report-I subsequently affirm the charge of fraud." Capuano then announced Davidson's punishment: two years loss of privileges in the use of his inmate account and the package room, along with restitution for the phone charges incurred by the prison in response to the claim for reimbursement.

Davidson responded by asking to make a statement. Capuano assented and Davidson began by protesting that he had not been given the "opportunity to present [his] case" or to explain "his side of the story". Capuano then made some reference to the written statement that plaintiff had given Hutchinson.[FN2] Davidson stated that he wanted to supplement the statement in order to "make it clear". He also asked to submit certain documents as evidence and to call witnesses to testify in his defense.

**\*3** In the ensuing discussion, Davidson offered to submit various pieces of correspondence and orders for merchandise that he authored under the title "Reverend", none of which were placed through the institution or out

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

of his inmate account. By these documents Davidson sought to prove that he had never used his clerical identity in the manner charged and to show that he had not placed the order in question. Plaintiff also denied that it was his signature on the order and argued that the circumstances pointed to a fraud committed by someone else to "harass" or to "spite" him. Regarding the accusation that he had sought multiple reimbursements, Davidson stated that, once he was informed that a refund was deposited in his account, he stopped all activity to collect the funds.

After Davidson's presentation Capuano stated that he still found plaintiff guilty. Davidson then argued that his prior disciplinary record did not warrant the penalty imposed. Capuano in response "held in abeyance" 18 months of the two year suspension of privileges. He did, however, state that he was now going to recommend to the "Program Committee" that plaintiff be transferred to another institution.

Following the hearing, Davidson wrote a letter to defendant Superintendent Harris protesting the outcome of the hearing and in particular claiming that Capuano had violated his due process rights. He stated that he had not been allowed to make a statement in his own defense and that Capuano had not permitted him to call witnesses or present documentary evidence.

On October 10, 1978, Capuano signed the "Superintendent's Proceeding Report." Under the heading "Evidence Relied Upon", he wrote: "Misbehavior Report submitted by S. Schriver, Steward". This form, along with the rest of the record of the proceeding was then submitted to Superintendent Harris for review.

By his affidavit submitted on this motion Harris explained the review process and its purpose (Harris Afft. ¶ 2):

[I]t was my practice as Superintendent of GHCF to review each of the proceedings to check for compliance with the procedural due process requirements set forth in Chapter V of 7 NYCRR ...

Such a review process would consist of my scanning the

entire Superintendent's Proceeding file ... to ascertain, among other things ... whether the facts of an incident had been adequately developed and the inmate given an opportunity to present a defense;

Harris did not, however, conduct the review of Davidson's hearing.[FN3] At that time, Harris was absent from the facility and Deputy Superintendent Keenan was appointed Acting Superintendent. In this role, Keenan handled routine matters, including the review of disciplinary matters. On October 10, 1978, Keenan reviewed Davidson's case and concluded that all applicable procedural due process requirements had been met.

Davidson wrote a second letter to Superintendent Harris on October 13, 1978. He referred to his initial correspondence and repeated his claim that he had been deprived of his due process rights. In particular, he quoted from provisions of the state regulations granting him the right to an impartial hearing officer and the opportunity to make an oral statement at the hearing. Defendant Keenan received both of plaintiff's letters in his capacity as Acting Superintendent. After speaking with Capuano about the complaints, Keenan rejected Davidson's arguments concerning the validity of the hearing and sent him a memorandum to that effect.

**\*4** In November of 1978, plaintiff filed two lawsuits, this Section 1983 action in federal court and an Article 78 proceeding in the New York Supreme Court, Dutchess County. In the latter case, brought against Superintendent Harris and Richard Hongisto, Commissioner of Correctional Services, plaintiff sought an order vacating the Superintendent's proceeding and restoring his lost privileges. As described more fully at p. 17, *infra,* the state court, by order dated January 31, 1979, granted the requested relief.

Plaintiff was transferred from Green Haven to another prison facility in January of 1979. The following March, he filed a second Section 1983 lawsuit in this court alleging that the transfer violated his First Amendment right to freely practice his religion. (79 Civ. 1523 (CES)). This case was tried before a jury which rendered a verdict in favor of the defendants.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

*DISCUSSION*

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* --- U.S. ----, 107 S.Ct. 1570 (1987).

On a motion for summary judgment, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion ...; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby,* 477 U.S. 242, 247-248 (1986) (emphasis in original). Material facts are determined by the substantive law underlying the action; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* The moving party bears the burden of demonstrating the absence of any material and genuine issue of fact in dispute. *Adickes v. Kress,* 398 U.S. 144, 157 (1970). Although this burden is a difficult one to meet, motions for summary judgment, when properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. United States Fire, supra,* 804 F.2d at 12. The Supreme Court has stated that a motion for summary judgment is properly regarded as:

an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action'.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact ..., but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*5 *Celotex v. Catrett,* 477 U.S. 317, 327 (1986).

I. *DEFENDANTS' MOTION: RES JUDICATA*

The defendants' first argument for dismissal of the complaint is that under the principle of res judicata, another Section 1983 lawsuit which was brought against the same three defendants, Harris, Keenan and Capuano, and decided against plaintiff bars him from pursuing this action. Res judicata provides that a valid judgment on the merits is a bar to a subsequent action between the same parties upon the same claim. "Such a judgment precludes subsequent litigation both of issues actually decided in determining the claim asserted in the first action and of issues that could have been raised in the adjudication of that claim." *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1259 (2d Cir.1983).

It is undisputed that in the previous lawsuit, there was a final judgment on the merits between the same parties. The sole issue remaining is whether the claim in the present case is the same as that raised in the previous litigation.

Although the instant case was filed first, plaintiff's other lawsuit, *Finkelstein v. Harris, Keenan, Butterfield, McDermott and Capuano,* 79 Civ. 1523 (CES), went to trial in August of 1983. In that action plaintiff sought to recover damages resulting from violation of his First Amendment rights by prison officials. He alleged that the defendants had transferred him to another maximum security facility with knowledge that he would be deprived of the kosher diet that he received at the Green Haven prison. A jury decided in favor of the defendants on this freedom of religion claim. In the pending suit, plaintiff is seeking damages for the violation of his due process rights in the prison disciplinary proceeding which eventually led to the transfer at issue in the other case. Plaintiff is alleging some of the same damages in both suits, that is the loss of prison employment and his kosher diet from the transfer.

The defendants argue that the overlap in the events underlying the two suits and the fact that the damages sought are partially the same is dispositive of the identity

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

of claims issue. These similarities, however, do not resolve the issue. "[T]he fact that several operative facts may be common to successive actions between the same parties does not mean that a judgment in the first will always preclude litigation in the second." *Tucker v. Arthur Anderson & Co.,* 646 F.2d 721, 727 (2d Cir.1981).

The test for determining if the claims asserted are the same for purposes of res judicata involves the application of several criteria: whether the same evidence is needed to maintain both causes of action; whether the essential facts and issues are similarly presented in both cases; and whether a different judgment in the second action would impair or destroy the rights or interests established by the first judgment. *See Hereneden v. Champion Intern. Corp.,* 525 F.2d 130, 133-134 (2d Cir.1975); *N.L.R.B. v. United Technologies, supra,* 706 F.2d at 1260.

First of all, the issues involved in the two suits are markedly different. In this case, the defendants' conduct with regard to Davidson's rights at the Superintendent's Proceeding is at the heart of the matter; in order to prevail, plaintiff must prove that the defendants violated his due process rights, and that these violations proximately caused his damages, including the transfer to another prison, and the subsequent loss of a job and a special diet. In the first case, by contrast, the primary issue was the defendants' knowledge of plaintiff's religious beliefs and their failure to accommodate his practices and diet in the transfer to another facility. Even though the transfer to another prison is an event which is involved in both actions, there is no question that the "wrongful acts" alleged against the defendants are different. *See Herenden, supra,* 525 F.2d at 134. It necessarily follows that no judgment obtained in the present case will impair or destroy any of the rights established by the prior judgment. The finding that the defendants were not liable under allegations that they deprived plaintiff of his freedom to practice his religion will not be affected by any determination as to whether the disciplinary hearing was valid under due process standards. Accordingly, I find that the claims asserted by plaintiff in the two lawsuits are not the same and that res judicata does not bar plaintiff from pursuing this action. Defendants' motion for summary judgment on this basis is denied.

II. *DEFENDANT HARRIS'S MOTION: LACK OF*

*PERSONAL INVOLVEMENT*

**\*6** Defendant David Harris, formerly the Superintendent of the Green Haven facility, has moved for dismissal of the complaint against him on the ground that he was not actually involved in or responsible for the alleged due process violations.[FN4] 42 U.S.C. § 1983 imposes personal liability on the individual who "subjects or causes to be subjected" any person to the deprivation of a right guaranteed by the federal Constitution or statutes. Accordingly, liability cannot be imposed simply on the basis of respondeat superior, *Monell v. Dept. of Social Services,* 436 U.S. 658 (1978), and personal involvement of the defendant must be shown. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978). In the prison setting, a Section 1983 damage claim against a prison official "requires a showing of more than the linkage in the prison chain of command." *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

The requisite showing of personal involvement in a case such as this may be made in several ways. As stated in *Williams v. Smith,* 781 F.2d 319, 321 (2d Cir.1986) (citations omitted):

The defendant may have directly participated in the infraction. A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong. A supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy to continue. Lastly, a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.

Plaintiff argues that Harris may be found "personally responsible" for his participation in the disciplinary proceeding process. According to plaintiff, Harris's selection of Capuano as hearing officer and his delegation of the review process to Keenan evinces either a policy of allowing constitutional deprivations to occur or gross negligence in the managing of his subordinates. The single incident alleged in this lawsuit, however, is insufficient proof of such claims. "[A]bsent more evidence of supervisory indifference, such as acquiescence in a prior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

pattern of conduct, a policy [may] not ordinarily be inferred from a single incident of illegality." *Sarus v. Rotundo,* 831 F.2d 397, 402 (2d Cir.1987) (quoting *Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.), *cert. denied,* 449 U.S. 1016 (1980)). *Cf. McCann v. Coughlin,* 698 F.2d 112 (2d Cir.1984), where the court held prison officials liable for their gross negligence and deliberate indifference upon a showing that that no prisoner had ever been allowed to call witnesses at a certain type of disciplinary proceeding, in clear violation of the Constitution.

**\*7** On the undisputed facts relating to Harris's role in the alleged due process violations, plaintiff, has, however, shown personal involvement in one area. Plaintiff is claiming that Capuano, by virtue of his supervisory relationship to the personnel who brought the charges, was biased and therefore Harris's appointment of Capuano as hearing officer deprived him of a fair hearing. If this claim against Capuano were meritorious, Harris's act of appointing Capuano would constitute direct participation by Harris in the deprivation of Davidson's due process rights.

I have determined, however, that no constitutional violation occurred when Capuano served as hearing officer (see pp. 19-20, *infra* ). Harris was not personally involved, therefore, in the claims alleged by plaintiff and he is entitled to summary judgment and dismissal of the complaint against him.

III. *DEFENDANTS KEENAN AND CAPUANO'S MOTION: ABSOLUTE IMMUNITY*

Defendants Keenan and Capuano move for summary judgment on the ground that they are entitled to the common law defense of absolute immunity from liability in this civil rights action. They argue that in their capacity as hearing officers they serve a "quasi-judicial" function and therefore cannot be held liable for any errors committed in the course of disciplinary proceedings. This argument is without merit. The Supreme Court has expressly held that prison officials who preside over disciplinary proceedings are not entitled to claim absolute immunity. *Cleavinger v. Saxner,* 474 U.S. 193 (1986).

IV. *PLAINTIFF'S MOTION: COLLATERAL ESTOPPEL*

Turning to the merits, plaintiff moves for partial summary judgment on the ground that the defendants are collaterally estopped from relitigating some of the liability issues that were determined against them in prior litigation. The prior litigation which plaintiff invokes is the Article 78 proceeding which he commenced in November, 1978 in the Supreme Court, Dutchess County. In that suit, Davidson alleged that he had been deprived of his due process rights under the federal Constitution and state law in the October 7, 1978 disciplinary hearing which is at issue in this lawsuit. The defendants in the proceeding were Superintendent Harris and Richard Hongisto, the Commissioner of the New York state prison system, and plaintiff sought only equitable relief: an order vacating the decision rendered at the disciplinary hearing and the restoration of his prison privileges.

Plaintiff seeks to preclude the defendants from relitigating the specific findings made by the Supreme Court on January 31, 1979, following an evidentiary hearing, namely, that plaintiff's constitutional due process rights were violated at the disciplinary hearing by Capuano's failure to consider documentary evidence and to allow Davidson to make a statement.

**\*8** The Second Circuit Court of Appeals has recently held, under very similar factual circumstances, that the plaintiff in a federal Section 1983 action is not entitled to use an Article 78 state court judgment for purposes of collateral estoppel. *Gutierrez v. Coughlin,* 841 F.2d 484 (2d Cir.1988). The Court cited its decision in the instant case, *Davidson v. Capuano,* 792 F.2d 275, 278 (2d Cir.1986), for the proposition that damages for civil rights violations may not be recovered in an Article 78 proceeding. Because of this, the Court found, the individuals named as defendants in the state action could not be held personally liable and therefore "they did not have the same incentive to litigate that state court action as they did the federal § 1983 action." *Id.* at 486 (citing to *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330-31 (1979)). The Court of Appeals also noted that, in the Article 78 proceeding, the defenses of absolute or qualified immunity, or lack of personal involvement, had not been available to the defendants. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

Plaintiff's motion for partial summary judgment on the basis of the doctrine of collateral estoppel is therefore denied.

V. *DEFENDANTS' MOTION: NO DUE PROCESS VIOLATIONS OCCURRED*

The defendants have moved for summary judgment on the ground that plaintiff's allegations of due process violations are meritless. A discussion of a prisoner's right to procedural due process must begin with the case of *Wolff v. McDonnell,* 418 U.S. 539, 563-572 (1974). In *Wolff,* the Supreme Court held that in disciplinary proceedings inmates are entitled to minimal due process rights. Under the Fourteenth Amendment, the inmate must receive advance written notice of the charges and be allowed to make a statement, call witnesses and present documentary evidence in his defense when doing so will not be unduly hazardous to institutional safety or correctional goals. 418 U.S. at 566. In addition, after the hearing is completed, the inmate must be given a written statement by the factfinder as to the evidence relied upon and the reasons for the disciplinary action taken. Under the guidance of *Wolff,* the lower federal courts have further delineated a prisoner's procedural entitlements, such as the right to a fair and impartial factfinder. *See McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983).[FN5]

A. *Appointment of Capuano as Hearing Officer*

Plaintiff claims that it was improper for Capuano to serve as hearing officer because of his supervisory relationship to the officers who originally filed the charges. It has been established in this Circuit that, in order to ensure a fair hearing, an administrator who was a witness to an act charged against an inmate, or who has investigated the underlying charges, may not serve as hearing officer. *McCann v. Coughlin, supra,* 698 F.2d at 122 n. 10. It is also true that "in some circumstances the nature of one's position or the relationship between that position and the outcome of the adjudication disqualifies that person from serving with the impartiality mandated by the Due Process Clause...." *Powell v. Ward,* 542 F.2d 101, 103 (2d Cir.1979).

When plaintiff was brought up on charges, Capuano served as the Deputy Superintendent for Administration and he was responsible for many areas of prison business, including Inmate Accounts and Inmate Claims. Acting in this role, Capuano served as the direct supervisor to Schriver and Keane, the personnel who authored the Misconduct Report filed against plaintiff. However, it is undisputed that Capuano was not personally involved in the investigation leading to the filing of formal charges and that he was not knowledgeable of the details or the outcome of the investigation prior to being appointed to hear the matter.

**\*9** Under these facts, it was proper for Capuano to serve as the hearing officer. The mere fact that Capuano heard a case which arose out of his area of administrative supervision does not offend due process. In *Powell v. Ward, supra,* the Court of Appeals modified a District Court injunction to remove a restriction against prison administrators responsible for institutional security from presiding over Superintendent's Proceedings at which an inmate was charged with acts threatening prison security. The rationale behind plaintiff's claim that Capuano could not conduct a hearing to determine the veracity of charges brought by subordinate employees within his sphere of responsibility was specifically rejected in the *Powell* case. The defendants are entitled to summary judgment on this claim.

B. *The Naming of Witnesses Who Capuano Interviewed*

Davidson's second alleged due process deprivation is that Capuano failed at the October 7, 1978 hearing to identify the persons who initiated the Misbehavior Report; while Capuano stated at the hearing that he had interviewed the authors of the report he did not tell plaintiff their names. It is unnecessary to determine if this error, in and of itself, would constitute a due process violation. Despite Capuano's omission, the names of the persons who filed the Report, Schriver and Keane, were plainly known to plaintiff at the time of the hearing. It is undisputed that Davidson was served with a copy of the report on September 8, 1978 and that the names of the authors are clearly noted on the report. Moreover, prior to the Superintendent's hearing, plaintiff had mailed a *pro se* complaint to this court (to begin this litigation) which named Schriver and Keane as defendants for their role in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

instigating charges against him.

C. *Davidson's Presentation of a Defense*

Plaintiff next charges that he was not permitted to present a defense to the charges at the hearing. First, Davidson alleges that Capuano did not allow him to submit documentary evidence in his favor. From the transcript of the hearing, it appears that plaintiff possessed certain documents that he wanted Capuano to consider. These documents were offered to prove that, although Davidson had used the name Reverend Ron Finkelstein to make purchases from retailers, he never utilized the title "Reverend" when placing orders through his prison account:

*Finkelstein:* I have not been given the opportunity to present my case. Now I have evidence here which I wish to present....

**\*10***Finkelstein:* Now the only time that I have used the name Rev. Finkelstein is when I had orders sent in as paid and you can examine them if you wish. It says here that they have been paid.

*Capuano:* Do you wish to submit them for the record?

*Finkelstein:* If you wish to examine them. I'd like to have them back since I don't have a photostatic of them, but if you'd like to look at them right here you can see they've all been paid for, and not one of them sir would be listed on the inmate account ledger because I've never sent them out through the institution....

*Capuanao:* How did you send these out?

*Finkelstein:* I had my folks ... send them out and pay for them and here's a receipt.... I have never made any orders ... for a substantial amount of money through the institution ..., never $34 or $35 and I've never used the title Rev. Finkelstein.

From this portion of the transcript I conclude that plaintiff was given an opportunity to present his documentary evidence at the hearing. Although the transcript does not indicate what weight Capuano gave the documents, the evidence was non-probative as to the particular incident of which plaintiff was charged and Capuano clearly had the right to disregard or exclude such evidence without offending due process of law. As the Supreme Court in *Wolff v. McDonnell, supra,* 418 U.S. at 566-67, noted:

[T]he inmate ... should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.... It may be that an individual threatened with serious sanctions would be normally entitled to present witnesses and *relevant documentary evidence,* but here we must balance the inmate's interest ... against the needs of the prison,.... prison officials must have the necessary discretion to keep the hearing within reasonable limits.... Although we do not prescribe it, it would be useful for the Committee to state its reasons for refusing to call a witness, whether it be for *irrelevance, lack of necessity*.... There is much play in the joints of the Due Process Clause, and we stop short of imposing a more demanding rule with respect to witnesses and documents. (emphasis added)

From the portion of the transcript quoted above, the documents plaintiff offered tended to prove only that plaintiff had in the past used the title "Reverend" to place orders, through his family, for outside merchandise. They did not prove or disprove whether the particular order to J.C. Penny at issue at the hearing was placed by him, or whether he had attempted to obtain duplicate refunds from the retailer and the institution. Capuano's conduct at the hearing with regard to plaintiff's documentary evidence did not violate plaintiff's due process rights and the defendants are entitled to summary judgment on this claim.

Plaintiff also argues that Capuano improperly refused his request to call witnesses to testify at the hearing. It is undisputed that Davidson asked Capuano to call inmate Conroy and Officer Gilroy, from the package room, to testify and that Capuano did not act on the request. Conroy and Gilroy were originally listed by plaintiff as witnesses when he solicited the assistance of Counselor Hutchinson

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

under 7 N.Y.C.R.R. § 253.3(1), prior to the hearing.

**\*11** Hutchinson took the statement of Conroy on September 28, 1978. The statement, which was made part of the hearing record, shows that Conroy's knowledge of the events leading up to the charges was limited to statements that plaintiff made to him. Conroy stated that prior to the filing of the Misconduct Report, Davidson had sought his advice on how to recover money improperly disbursed from an inmate account. At that time, plaintiff told Conroy that the order was not his and that someone had forged his name.

Plaintiff's express purpose is seeking the testimony of Gilroy was to verify that he had not received any package which corresponded to the order at issue. Although Officer Gilroy's statement was never taken, the desired information that no such package had been received was supplied by Officer Boluanger in a statement which was made part of the hearing record. Gilroy's statement would have been cumulative.

Under these undisputed facts,[FN6] the absence of these witness at the hearing did not breach the due process clause. Procedural due process only requires that relevant, probative testimony be received at a disciplinary hearing. "While there can be no doubt that a prisoner should ordinarily be permitted to call witnesses in his defense, the prisoner's right is obviously not unbridled and must at a minimum be subject to a preliminary showing that the proposed witnesses may have probative testimony to offer." Pino v. Dalsheim, 605 F.Supp. 1305, 1315 (S.D.N.Y.1984).

The third aspect of his defense that Davidson claims Capuano denied him at the hearing was an opportunity to make an oral statement. It is undisputed that Capuano began the proceeding by reading the charges and then pronouncing his determination that plaintiff was guilty. When Davidson protested that he be allowed to give his side of the story, however, Capuano allowed him to speak.

A lengthy dialogue then ensued between Davidson and Capuano during which plaintiff denied that it was his signature on the order form in question and offered the

documents (discussed above) to show that he only used the name "Reverend" to place orders through family intermediaries. In addition, plaintiff argued that the package may have been directed to another part of the institution because, as evidenced by the statement of officer Boluanger, the package never arrived. As to the accusation that he sought duplicate refunds, plaintiff stated that he received the "pink slip" informing him that the refund check had been deposited in his account a month late and that, once he did learn that the refund came in, he stopped all action to collect from the department store. Plaintiff also stated that, although he did not know who placed the order, it could be someone with a personal grudge against him, who placed the order out of spite or in order to harass him. In support of this argument, plaintiff noted that the shoes were ordered in sizes 8 and 9, neither of which would fit him. Finally, he related that Hutchinson, the prison employee he chose to help him assemble a defense, told him that a similar fraud had occurred several months before in the institution.

Minimum due process, as set forth by Wolff v. McDonnell, supra, requires only that the inmate facing disciplinary charges be given an opportunity to confront the accusations by making a statement in his defense which will be weighed by the factfinder against the evidence presented against him. The transcript reveals that plaintiff was given ample opportunity to present his side of the story and argue against the accusations made against him. Although Capuano erred in assuming that Davidson had presented his defense in a prior written statement and in pronouncing the finding of guilt at the outset of the hearing, the error, which was promptly corrected, does not rise to the level of a due process violation.[FN7]

D. *The Statement of Evidence Relied Upon*

**\*12** The last due process violation alleged by plaintiff is that Capuano's written statement of the evidence he relied upon in determining Davidson's guilt was inadequate. The Supreme Court held in Wolff v. McDonnell, supra, 418 U.S. at 564, that "there must be a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." (citation omitted). Such statements are necessary because (Id. at 565):

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

[T]he actions taken at such proceedings may involve review by other bodies. They might furnish the basis of a decision ... to transfer an inmate to another institution ..., and are certainly likely to be considered by state parole authorities.... Written records of proceedings will thus protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding. Further, as to the disciplinary proceeding itself, the provision for a written record helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly. Without written records, the inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others.

In this instance, Capuano, following the hearing, filled out a form entitled "Superintendent's Proceeding Report". Under the heading of "Evidence Relied Upon", he wrote: "Misbehavior Report submitted by S. Schriver, Steward". In light of the nature of the charges and the quantity and quality of the evidence presented to Capuano before and during the hearing, this statement does not fulfill the requirements of *Wolff, supra,* and plaintiff's right to due process was violated in this regard.

As previously described, Capuano was presented with many sources of information concerning the charges brought against Davidson. The Misbehavior Report was only the first document to set forth the accusations and to initiate the disciplinary proceedings. After Capuano was appointed hearing officer he was provided with additional documents, including two reports by Counselor Hutchinson, and the written statements of plaintiff, inmate Conroy and Officer Boluanger.[FN8] In addition, Capuano personally conducted interviews with Schriver and Keane, the authors of the Misbehavior Report, during which he solicited inculpatory information concerning the charges which went outside the scope of the original report.

Similar, limited statements listing only a source or sources of information relating to charges have been found to be inadequate. As stated by the Court in *Powell v. Ward,* 487 F.Supp. 917, 930 (S.D.N.Y.1980), *modified on other grounds,* 643 F.2d 924 (2d Cir.), *cert. denied,* 454 U.S. 832 (1981):

**\*13** ... the forms themselves are inadequately completed ... [T]he statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, one statement lists as evidence relied upon 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young.' This information does not 'protect the inmate against collateral consequences based on a misunderstanding of the nature of the original proceeding.' "

Here too, the "statement" by Capuano consists merely of a reference to a source of information presented to him; even though Capauno was not required to raise and analyze every argument presented by Davidson (*see, Pino v. Dalsheim,* 605 F.Supp. 1305, 1316 (S.D.N.Y.1984)) the Constitution mandates that an explanation of the evidence relied on consist of more than the incorporation of a single report when the charge is refuted and complex or lengthy evidence bearing on the charges is presented to the factfinder.

The case law from other Circuits supports this conclusion. In *Hayes v. Thompson,* 555 F.2d 625, 632-33 (7th Cir.), *cert. denied* 434 U.S. 959 (1977), the Court held that a statement of the evidence relied on, which simply stated that the decision was based upon two reports filed by correctional personnel, did not meet minimum due process requirements:

Rather than pointing out the essential facts upon which the inferences were based, the Committee merely incorporated the violation report and the special investigator's report. This general finding does not ensure that the prison officials will act fairly. Nor will this finding protect against subsequent collateral effects based on a misunderstanding of the initial decision.

*See also, King v. Wells,* 760 F.2d 89, 93-94 (6th Cir.1985).

In cases where statements referring only to whole reports submitted to the factfinder have been found to be adequate, it was evident what evidence the factfinder

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

relied on and how the finding of guilt was reached. *See e.g. Brown v. Frey,* 807 F.2d 1407, 1412-14 (8th Cir.1986); *Saenz v. Young,* 811 F.2d 1172, 1174 (7th Cir.1987). In *Brown,* the Court declined to follow the requirement in the Sixth and Seventh Circuits of what it termed a 'technical and detailed' reconstruction of the incident. 807 F.2d at 1413. It upheld a statement which incorporated a "violation conduct report" and a joint memorandum by three correctional officers involved in the incident because an examination of the documents made it "immediately apparent what statements in them were relied upon by the board in reaching its decision." Furthermore, the statements implicating the prisoner were unambiguous and nothing remaining in the documents was contradictory to the decision of guilt in the matter. The Court warned, however, that in certain situations due process would require a disciplinary board to refer to specific statements within the submitted reports, rather than just incorporating the report by reference. "For example, a certain report may be so lengthy ..., or the report may contain contradictory or ambiguous statements, making it difficult to ascertain with certainty what statements in the report the board relied on in reaching its decision." *Id.*

Similarly, the Court in *Saenz, supra,* upheld an evidentiary statement which referred only to a guard's written statement. The guard had witnessed an attempted battery by one inmate on another and had recorded his observations. At the hearing, the report was submitted and the board also considered the inmate's testimony denying involvement in the incident. Under these circumstances, the Court found it "plain the committee relied on the reporting officer's eyewitness account.... Obviously, the committee believed the conduct report and disbelieved the plaintiff. As there is no mystery about its reasoning process, despite the extreme brevity ... that statement is not so deficient as to create error of constitutional magnitude." *Id.* at 1174. The Court distinguished previous holdings in the Circuit which rejected similar statements of reasons, because in those previous cases either the charge, or the evidence before the disciplinary body, was complicated. In those instances, when "the committee fails to explain its findings, the reviewing court will find it difficult and maybe impossible to determine whether the committee on one hand found facts showing that the prisoner really was guilty of the charges, or on the other hand based the finding of guilt on erroneous legal premises." *Id.*

*14 In the instant case, neither the charge nor the evidence presented to Capuano for a decision was so simple that the mere incorporation of the misconduct report satisfied due process. Moreover, in contrast to the circumstances in *Brown, supra,* it is not readily apparent which part or parts of the misconduct report Capuano relied on in determining that Davidson was guilty of the charges.

Plaintiff is entitled to summary judgment on this issue of liability. Although plaintiff's motion does not seek summary judgment on the merits of his due process claims, this Court is empowered to award summary judgment to the non-moving party when there are no disputed issues of material fact and judgment is appropriate as a matter of law. *See Lowenschuss v. Kane,* 520 F.2d 255, 261 (2d Cir.1975); *Brandon v. Board of Ed. of Guilderland,* 487 F.Supp. 1219, 1233 (S.D.N.Y.1980); *aff'd,*635 F.2d 971 (2d Cir.1980); *cert. denied,*454 U.S. 1123 (1981).

VI. *DEFENDANTS' MOTION: QUALIFIED IMMUNITY FROM LIABILITY*

The defendants argue that, even if any of plaintiff's procedural due process rights were violated, they acted in good faith and are thus immune from personal liability for damages.

The affirmative defense of qualified or "good faith" immunity will generally shield administrative officials performing discretionary functions from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). As explained in the recent Supreme Court decision in *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987), (citations omitted): "[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent."

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

The use of this objective standard, measuring the reasonableness of a person's conduct by reference to clearly established law, permits the resolution of insubstantial claims on summary judgment. As stated in *Harlow,* at pp. 818-19 (footnote omitted):

**\*15** [T]he judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at the time was not clearly established, an official could not ..., fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense should ordinarily fail, since a reasonably competent official should know the law governing his conduct.

*See also, McCann v. Coughlin,* 698 F.2d 112, 124 (2d Cir.1983), where the Court stated: "[Prison] officials can be held liable only for actions which were unlawful at the time in issue.... [They], however, may be charged with constructive knowledge of the established law at the time." (citations omitted).

At the time of plaintiff's 1978 disciplinary hearing, it was clearly established under *Wolff v. McDonnell, supra,* that a prisoner had the right to receive a statement of the evidence relied upon to protect him from collateral consequences and to provide a sufficient basis for review of the proceedings. *See McCann v. Coughlin, supra,* 698 F.2d at 124-25. Under *Anderson v. Creighton, supra,* 107 S.Ct. at 3039, it must also be determined whether a reasonable official would understand that the statement of evidence relied on in this case violated that right, that is to say, whether in light of preexisting law, the unlawfulness of the statement was apparent.

I conclude that Capuano and Keenan are not entitled to immunity under this standard. This conclusion follows from the decision in *Powell v. Ward, supra,* 487 F.Supp. at 936, where the Court found the superintendent of a New York State prison facility in contempt and ordered damages and injunctive relief for her failure to comply with the procedural requirements established in *Wolff v. McDonnell,* and set forth in a 1975 Order by the district

court in response to earlier litigation. (See *Powell v. Ward,* 392 F.Supp. 628 (S.D.N.Y.1975), *modified on appeal,* 542 F.2d 101 (2d Cir.1976)). Specifically, the Court found (among other violations) that, during the time between the issuance of the Order in 1975 and the contempt motion filed in early 1979, the prison administrators had failed to provide adequate statements of the evidence they relied on in ruling on disciplinary matters. As noted earlier (see p. 28, *infra* ) the Court found that statements akin to the one at issue here were constitutionally inadequate: "The statement of evidence relied upon most often consists of a list of the source of information presented to the hearing board. For example, ... 'misbehavior reports, discussion at Superintendent's Proceeding. Interview with Sgt. Pompellone re: charges and information ...' Another statement merely says 'reports from C.O. Stephen and C.O. Young.'"

The plaintiffs in *Powell* requested damages resulting from the due process violations and the defendant raised the defense of qualified immunity. In response, the Court held (487 F.Supp. at 936): "The immunity defense is unavailing here, where 'the constitutional right allegedly infringed was clearly established at the time of her challenged conduct', 'she knew or should have known of that right, and [she] knew or should have known that [her] conduct violated the constitutional norm' " (quoting *Procunier v. Navarette,* 434 U.S. 555, 562 (1978)). *See also Chavis v. Rowe,* 643 F.2d 1281, 1288-89 (7th Cir.), *cert. denied,* 454 U.S. 907 (1981)

**\*16** The plaintiff is entitled to summary judgment on this issue. Defendants Capuano and Keenan are not immune from personal liability and damages may be assessed against them.

VII. *DEFENDANTS' MOTION: PLAINTIFF IS LIMITED TO NOMINAL DAMAGES*

The defendants' final argument on their motion for summary judgment is that plaintiff is limited to nominal damages for any due process violations that may have occurred. In order to collect damages in a Section 1983 action for the violation of due process, the plaintiff must demonstrate that the constitutional violation caused him some actual injury, for damages are not "presumed to flow

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

from every deprivation of procedural due process". *Carey v. Piphus,* 435 U.S. 247, 263 (1978). If the plaintiff cannot show causation, only nominal damages may be awarded. *Id.; McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983).

In his complaint, plaintiff has alleged that he was injured in several ways and that the constitutional violations caused his injuries. Specifically, he claims that he was deprived of the privileges of using the package room and his inmate account for approximately a one year period and that he was wrongfully transferred to another institution where he lost the benefit of a prison job and a kosher diet.

The failure of Capuano to provide an adequate written statement of the evidence relied on did not "directly bear on the integrity of [the] decision making process" or the outcome of the hearing. *McMann v. Coughlin, supra,* 698 F.2d at 126. Here, as in *McCann,* plaintiff's inability to show a link between the inadequate statement of evidence and the outcome of the hearing precludes him from demonstrating that the punishment he received was an injury caused by this particular due process violation.

Similarly, in responding to defendant's motion, plaintiff has not shown that the transfer to another prison (and thus the loss of the job and the diet), as recommended by Capuano at the close of the disciplinary hearing, is in any way attributable to the inadequate statement of evidence relied on. There is simply no basis within the record upon which a factfinder could find that the inadequacy of the statement played any role in the decision to transfer him to another institution. As plaintiff has failed to demonstrate this causal connection, an award of damages "would constitute a windfall, rather than compensation." *Carey v. Piphus, supra,* 435 U.S. at 260.

Plaintiff is entitled, however, to recover nominal damages, for "the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266-67. The amount due plaintiff is one dollar. *See, e.g. Auwood v. Harry Brandt Booking Office, Inc.,* 647 F.Supp. 1551, 1555-56 (D.Conn.1986).

**\*17** Plaintiff's Second Amended Complaint also includes a prayer for punitive damages. Punitive damages may be awarded in a Section 1983 action (*see Carlson v. Green,* 446 U.S. 14, 22 (1980)), when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983).

I find that summary judgment is properly entered for the defendants on this issue, for, as stated in *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (quoting *Anderson v. Liberty Lobby, supra* ):

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict...."

"In essence, ... the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

In this instance, plaintiff, in opposing defendants' motion for summary judgment on the issue of punitive damages must offer concrete evidence from which a reasonable juror could return a verdict in his favor as to defendant's state of mind (that is evil motive or intent, or reckless or callous indifference to plaintiff's rights) in order to recover punitive damages. *See Anderson v. Liberty Lobby, supra,* 477 U.S. at 256;*Contemporary Mission Inc. v. New York Times Co.,* 842 F.2d 612, 621-22 (2d Cir.1988).

Capuano and Keenan have submitted affidavits on the motion for summary judgment in which they explain their conduct with regard to plaintiff's disciplinary proceeding. Their statements concerning the statement of evidence relied on by Capuano does not reflect the type of conduct or state of mind which is susceptible to an award of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

punitive damages. In response, plaintiff has not presented any evidence to this Court to support his wholly conclusory claim that the defendants' conduct in this matter was such that punitive damages may be awarded.

Rule 56(e) provides that a party opposing a properly supported motion for summary judgment may not rest upon "mere allegation ..., but must set forth specific facts showing that there is a genuine issue for trial.... This is true even where the evidence is likely to be within the possession of the defendant [e.g. the defendant's state of mind], as long as the plaintiff has had a full opportunity to conduct discovery". *Anderson, supra,* 477 U.S. at 256-257. The defendants are therefore granted summary judgment on the issue of punitive damages.

*CONCLUSION*

Defendant Harris' motion for summary judgment is granted. Defendants Capuano and Keenan are granted summary judgment as to all of plaintiff's due process claims except that pertaining to the adequacy of the post-hearing statement of evidence relied on. As to that particular claim and the defendants' defense of qualified immunity, the plaintiff is granted summary judgment. The defendants' motion on the issues of nominal and punitive damages is granted. The parties are directed to submit a proposed judgment pursuant to this order on five days' notice.

**\*18** SO ORDERED.

FN1. The hearing was tape recorded and a transcript of the hearing has been submitted by the defendants as an exhibit to their motion. Plaintiff does not dispute the accuracy of the transcript of the tape recording.

FN2. The exact reference is not clear from the transcript. It is undisputed that certain portions of the tape are inaudible, and there is no material dispute as to what occurred during the moments of inaudibility.

FN3. The identity of the person who conducted the review in this case was the source of some confusion. The review form was originally thought by all parties to have been signed by Harris, but it is now undisputed that defendant Keenan conducted the review and signed the review form in his own name, but over the signature line of "David H. Harris."

FN4. Harris is the only defendant to move for dismissal on this basis.

FN5. Plaintiff argues that the defendants violated not only his rights under the Constitution, but also specific state regulations governing disciplinary proceedings. (*See,* 7 N.Y.C.R.R., part 253, chapter V.). He has not set forth a pendent state claim, but is contending that the violation of state regulations is actionable under Section 1983. This contention is meritless. "[I]t is unnecessary for us to determine if [the defendants] have violated any applicable state law. Clearly, [such] a violation is not cognizable under § 1983." *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985). "State procedural requirements do not establish federal constitutional rights." *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,*--- U.S. ----, 108 S.Ct. 229 (1987).

FN6. Plaintiff has never suggested that these witnesses could have offered any other information or that they would have testified any differently at the hearing if they were called.

FN7. Capuano has submitted an affidavit in support of his motion for summary judgment, in which he states that he did not take plaintiff's oral statement prior to finding him guilty because he believed that plaintiff's defense was contained in the 2 page written statement submitted to Counselor Hutchinson. Although Capuano admits that prior to the hearing he had determined that Davidson was guilty of the charges, he states that, once he realized his error regarding the written statement, he considered

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)
(Cite as: 1988 WL 68189 (S.D.N.Y.))

what Davidson said at the hearing and then confirmed his earlier findings after no new evidence came to light.

My conclusion that no due process violation took place does not rest upon Capuano's explanation. The critical factor is that, on the undisputed record of the proceedings, Davidson was allowed to speak at length in his defense.

FN8. It is unclear what other sources of evidence were reviewed by Capuano prior to the hearing. The defendants, in support of their motion for summary judgment have provided copies of all the forms, correspondence, memoranda and records (authored by the plaintiff, the department store personnel and the prison staff) having to do with the order for merchandise, the investigation following plaintiff's denial of the order and the efforts made to secure a reimbursement of funds. Although Capuano, in his affidavit in support of the motion, does not discuss these documents, both Hutchinson, in his preliminary report, and Schriver, in her interview, referred Capuano to some additional documentation which they believed supported the accusations against plaintiff.

S.D.N.Y.,1988.
Davidson v. Capuano
Not Reported in F.Supp., 1988 WL 68189 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

Supreme Court of the United States
Cordell PEARSON, et al., Petitioners,
v.
Afton CALLAHAN.
**No. 07-751.**

Argued Oct. 14, 2008.
Decided Jan. 21, 2009.

**Background:** Arrestee brought § 1983 action alleging that police officers violated his Fourth Amendment rights by entering his home without a warrant. The United States District Court for the District of Utah, 2006 WL 1409130, granted officers summary judgment based on qualified immunity. Arrestee appealed. The United States Court of Appeals for the Tenth Circuit, Murguia, District Judge, sitting by designation, 494 F.3d 891, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Alito, held that:
(1) in resolving government officials' qualified immunity claims, courts need not first determine whether facts alleged or shown by plaintiff make out violation of constitutional right, receding from *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, and
(2) officers were entitled to qualified immunity.

Reversed.

West Headnotes

**[1] Civil Rights 78** ⚷ **1376(2)**

78 Civil Rights
   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause

     78k1376 Government Agencies and Officers
       78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which reasonable person would have known.

**[2] Officers and Public Employees 283** ⚷ **114**

283 Officers and Public Employees
   283III Rights, Powers, Duties, and Liabilities
     283k114 k. Liabilities for Official Acts. Most Cited Cases
Protection of qualified immunity applies regardless of whether government official's error is mistake of law, mistake of fact, or mistake based on mixed questions of law and fact.

**[3] Courts 106** ⚷ **90(1)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision
       106k88 Previous Decisions as Controlling or as Precedents
         106k90 Decisions of Same Court or Co-Ordinate Court
           106k90(1) k. In General. Most Cited Cases
Although Supreme Court approaches reconsideration of its decisions with utmost caution, stare decisis is not an inexorable command.

**[4] Courts 106** ⚷ **90(1)**

106 Courts
   106II Establishment, Organization, and Procedure
     106II(G) Rules of Decision

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(1) k. In General. Most Cited Cases
Revisiting precedent is particularly appropriate where departure would not upset expectations, precedent consists of judge-made rule that was recently adopted to improve operation of courts, and experience has pointed up precedent's shortcomings.

**[5] Courts 106 ☞ 89**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k89 k. In General. Most Cited Cases

**Courts 106 ☞ 93(1)**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k93 Rules of Property
106k93(1) k. In General. Most Cited Cases
Considerations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved; opposite is true in cases involving procedural and evidentiary rules that do not produce such reliance.

**[6] Courts 106 ☞ 89**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as

Precedents
106k89 k. In General. Most Cited Cases
*Saucier's* mandatory, two-step rule for resolving all qualified immunity claims could be appropriately revisited, despite doctrine of stare decisis; two-step protocol was judge made and implicated important matter involving internal Judicial Branch operations, rule did not affect way in which parties ordered their affairs, withdrawing from rule would not upset settled expectations on anyone's part, and general presumption that legislative changes should be left to Congress was not implicated.

**[7] Courts 106 ☞ 90(4)**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(4) k. Construction and Operation of Statutes. Most Cited Cases
Considerations of stare decisis weigh heavily in area of statutory construction, where Congress is free to change Supreme Court's interpretation of its legislation.

**[8] Courts 106 ☞ 90(3)**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(3) k. Constitutional Questions. Most Cited Cases

**Courts 106 ☞ 90(4)**

106 Courts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(4) k. Construction and Operation of Statutes. Most Cited Cases
Constitutional or statutory precedent is properly challenged, where its justification was badly reasoned or rule has proved to be unworkable.

**[9] Courts 106 ☞ 90(1)**

106 Courts
106II Establishment, Organization, and Procedure
106II(G) Rules of Decision
106k88 Previous Decisions as Controlling or as Precedents
106k90 Decisions of Same Court or Co-Ordinate Court
106k90(1) k. In General. Most Cited Cases
Where decision has been questioned by members of Supreme Court in later decisions and has defied consistent application by lower courts, these factors weigh in favor of reconsideration.

**[10] Civil Rights 78 ☞ 1376(1)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(1) k. In General. Most Cited Cases

**Civil Rights 78 ☞ 1376(2)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause

78k1376 Government Agencies and Officers
78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
While *Saucier*'s two-step sequence for resolving government officials' qualified immunity claims, whereby court must decide (1) whether facts alleged or shown by plaintiff make out violation of constitutional right, and (2) if so, whether that right was clearly established at time of defendant's alleged misconduct, is often appropriate, courts may exercise their sound discretion in deciding which of the two prongs should be addressed first in light of circumstances in the particular case at hand, receding from *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272.

**[11] Officers and Public Employees 283 ☞ 114**

283 Officers and Public Employees
283III Rights, Powers, Duties, and Liabilities
283k114 k. Liabilities for Official Acts. Most Cited Cases
Qualified immunity is immunity from suit rather than mere defense to liability.

**[12] Civil Rights 78 ☞ 1376(6)**

78 Civil Rights
78III Federal Remedies in General
78k1372 Privilege or Immunity; Good Faith and Probable Cause
78k1376 Government Agencies and Officers
78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Officers' entry into home without warrant to make arrest, based on consent given to informant, did not violate clearly established law, and thus, officers were protected by qualified immunity from arrestee's Fourth Amendment claim; although issue had not been decided in officers' circuit, "consent-once-removed" doctrine had been accepted by three Federal Courts of Appeals and two State Supreme Courts. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

**[13]** Civil Rights 78 🗝️      1376(6)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
Officer conducting search is entitled to qualified immunity where clearly established law does not show that search violated Fourth Amendment. U.S.C.A. Const.Amend. 4.

**[14]** Civil Rights 78 🗝️      1376(2)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Qualified immunity inquiry turns on objective legal reasonableness of government official's action, assessed in light of legal rules that were clearly established at time it was taken.

**[15]** Civil Rights 78 🗝️      1376(2)

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases
Principles of qualified immunity shield officer from personal liability when officer reasonably believes that his or her conduct complies with the law.

***810**Syllabus<sup>FN*</sup>

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

After the Utah Court of Appeals vacated respondent's conviction for possession and distribution of drugs, which he sold to an undercover informant he had voluntarily admitted into his house, he brought this 42 U.S.C. § 1983 damages action in federal court, alleging that petitioners, the officers who supervised and conducted the warrantless search of the premises that led to his arrest after the sale, had violated the Fourth Amendment. The District Court granted summary judgment in favor of the officers. Noting that other courts had adopted the "consent-once-removed" doctrine-which permits a warrantless police entry into a home when consent to enter has already been granted to an undercover officer who has brought contraband in plain view-the court concluded that the officers were entitled to qualified immunity because they could reasonably have believed that the doctrine authorized their conduct. Following the procedure mandated in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272, the Tenth Circuit held that petitioners were not entitled to qualified immunity. The court disapproved broadening the consent-once-removed doctrine to situations in which the person granted initial consent was not an undercover officer, but merely an informant. It further held that the Fourth Amendment right to be free in one's home from unreasonable searches and arrests was clearly established at the time of respondent's arrest, and determined that, under this Court's clearly established precedents, warrantless entries into a home are *per se* unreasonable unless they satisfy one of the two established exceptions for consent and exigent circumstances. The court concluded that petitioners**811** could not reasonably have believed that their conduct was lawful because they knew that (1) they had no warrant; (2) respondent had not consented to their entry; and (3) his consent to the entry of an informant could not reasonably be interpreted to extend to them. In granting certiorari, this Court directed the parties to address whether *Saucier* should be overruled in light of widespread criticism directed at it.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

*Held:*

1. The *Saucier* procedure should not be regarded as an inflexible requirement. Pp. 815 - 822.

(a) *Saucier* mandated, see 533 U.S., at 194, 121 S.Ct. 2151, a two-step sequence for resolving government officials' qualified immunity claims: A court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was "clearly established" at the time of the defendant's alleged misconduct, *id.,* at 201, 121 S.Ct. 2151. Qualified immunity applies unless the official's conduct violated such a right. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523. Pp. 815 - 816.

(b) *Stare decisis* does not prevent this Court from determining whether the *Saucier* procedure should be modified or abandoned. Revisiting precedent is particularly appropriate where, as here, a departure would not upset settled expectations, see, *e.g., United States v. Gaudin,* 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444; the precedent consists of a rule that is judge-made and adopted to improve court operations, not a statute promulgated by Congress, see, *e.g., State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275; and the precedent has "been questioned by Members of th[is] Court in later decisions, and [has] defied consistent application by the lower courts," *Payne v. Tennessee,* 501 U.S. 808, 829-830, 111 S.Ct. 2597, 115 L.Ed.2d 720. Respondent's argument that *Saucier* should not be reconsidered unless the Court concludes that it was "badly reasoned" or that its rule has proved "unworkable," see *Payne, supra,* at 827, 111 S.Ct. 2597, is rejected. Those standards are out of place in the present context, where a considerable body of new experience supports a determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained. Pp. 816 - 818.

(c) Reconsideration of the *Saucier* procedure demonstrates that, while the sequence set forth therein is often appropriate, it should no longer be regarded as mandatory in all cases. Pp. 818 - 822.

(i) The Court continues to recognize that the *Saucier* protocol is often beneficial. In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. And *Saucier* was correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable for questions that do not frequently arise in cases in which a qualified immunity defense is unavailable. See 533 U.S., at 194, 121 S.Ct. 2151. P. 818.

(ii) Nevertheless, experience in this Court and the lower federal courts has pointed out the rigid *Saucier* procedure's shortcomings. For example, it may result in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the case's outcome, and waste the parties' resources by forcing them to assume the costs of litigating constitutional questions and endure delays attributable to resolving those questions when the suit otherwise could be disposed **\*812** of more readily. Moreover, although the procedure's first prong is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development, as where, *e.g.,* a court of appeals decision is issued in an opinion marked as not precedential. Further, when qualified immunity is asserted at the pleading stage, the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed. And the first step may create a risk of bad decisionmaking, as where the briefing of constitutional questions is woefully inadequate. Application of the *Saucier* rule also may make it hard for affected parties to obtain appellate review of constitutional decisions having a serious prospective effect on their operations. For example, where a court holds that a defendant has committed a constitutional violation, but then holds that the violation was not clearly established, the defendant, as the winning party, may have his right to appeal the adverse constitutional holding challenged. Because rigid adherence to *Saucier* departs from the general rule of constitutional avoidance, cf., *e.g., Scott v. Harris,* 550 U.S. 372, 388, 127 S.Ct. 1769, 167 L.Ed.2d 686, the Court may appropriately decline to mandate the order of decision that the lower courts must follow, see, *e.g.,Strickland v. Washington,* 466 U.S. 668, 697, 104 S.Ct. 2052, 80 L.Ed.2d 674. This flexibility properly reflects the Court's respect for the lower federal courts. Because the two-step *Saucier* procedure is often, but not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

always, advantageous, those judges are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case. Pp. 818 - 822.

(iii) Misgivings concerning today's decision are unwarranted. It does not prevent the lower courts from following *Saucier;* it simply recognizes that they should have the discretion to decide whether that procedure is worthwhile in particular cases. Moreover, it will not retard the development of constitutional law, result in a proliferation of damages claims against local governments, or spawn new litigation over the standards for deciding whether to reach the particular case's merits. Pp. 822 - 823.

2. Petitioners are entitled to qualified immunity because it was not clearly established at the time of the search that their conduct was unconstitutional. When the entry occurred, the consent-once-removed doctrine had been accepted by two State Supreme Courts and three Federal Courts of Appeals, and not one of the latter had issued a contrary decision. Petitioners were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on consent-once-removed entries. See *Wilson v. Layne,* 526 U.S. 603, 618, 119 S.Ct. 1692, 143 L.Ed.2d 818. P. 823.

494 F.3d 891, reversed.

ALITO, J., delivered the opinion for a unanimous Court. Peter Stirba, Salt Lake City, Utah, for petitioners, by Malcolm L. Stewart for United States as amicus curiae, by special leave of Court, supporting petitioners.

Theodore P. Metzler, Jr., Washington, D.C., for respondent.

Peter Stirba, Counsel of Record, Meb W. Anderson, Stirba & Associates, Salt Lake City, Utah, Orin S. Kerr, Washington, DC, for petitioners.

James K. Slavens, Fillmore, Utah, Robert A. Long, Jr., Counsel of Record, Theodore P. Metzler, Jr., Covington & Burling LLP, Washington, D.C., for Respondent.

For U.S. Supreme Court Briefs, see:**813** 2008 WL 2367229 (Pet.Brief)2008 WL 3895481 (Resp.Brief)2008 WL 4154542 (Reply.Brief)

Justice ALITO delivered the opinion of the Court.

This is an action brought by respondent under Rev. Stat. § 1979, 42 U.S.C. § 1983, against state law enforcement officers who conducted a warrantless search of his house incident to his arrest for the sale of methamphetamine to an undercover informant whom he had voluntarily admitted to the premises. The Court of Appeals held that petitioners were not entitled to summary judgment on qualified immunity grounds. Following the procedure we mandated in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Court of Appeals held, first, that respondent adduced facts sufficient to make out a violation of the Fourth Amendment and, second, that the unconstitutionality of the officers' conduct was clearly established. In granting review, we required the parties to address the additional question whether the mandatory procedure set out in *Saucier* should be retained.

We now hold that the *Saucier* procedure should not be regarded as an inflexible requirement and that petitioners are entitled to qualified immunity on the ground that it was not clearly established at the time of the search that their conduct was unconstitutional. We therefore reverse.

I

A

The Central Utah Narcotics Task Force is charged with investigating illegal drug use and sales. In 2002, Brian Bartholomew, who became an informant for the task force after having been charged with the unlawful possession of methamphetamine, informed Officer Jeffrey Whatcott that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

respondent Afton Callahan had arranged to sell Bartholomew methamphetamine later that day.

That evening, Bartholomew arrived at respondent's residence at about 8 p.m. Once there, Bartholomew went inside and confirmed that respondent had methamphetamine available for sale. Bartholomew then told respondent that he needed to obtain money to make his purchase and left.

Bartholomew met with members of the task force at about 9 p.m. and told them that he would be able to buy a gram of methamphetamine for $100. After concluding that Bartholomew was capable of completing the planned purchase, the officers searched him, determined that he had no controlled substances on his person, gave him a marked $100 bill and a concealed electronic transmitter to monitor his conversations, and agreed on a signal that he would give after completing the purchase.

The officers drove Bartholomew to respondent's trailer home, and respondent's daughter let him inside. Respondent then retrieved a large bag containing methamphetamine from his freezer and sold Bartholomew a gram of methamphetamine, which he put into a small plastic bag. Bartholomew gave the arrest signal to the officers who were monitoring the conversation, and they entered the trailer through a porch door. In the enclosed porch, the officers encountered Bartholomew, respondent, and two other persons, and they saw respondent drop a plastic bag, which they later determined contained methamphetamine. The officers then conducted a protective sweep of the premises. In addition to the large bag of methamphetamine, the officers recovered the marked bill from respondent and a small bag containing methamphetamine from Bartholomew, and they found drug syringes in the residence. **814 As a result, respondent was charged with the unlawful possession and distribution of methamphetamine.

B

The trial court held that the warrantless arrest and search were supported by exigent circumstances. On respondent's appeal from his conviction, the Utah attorney general conceded the absence of exigent circumstances, but urged that the inevitable discovery doctrine justified introduction of the fruits of the warrantless search. The Utah Court of Appeals disagreed and vacated respondent's conviction. See *State v. Callahan,* 2004 UT App. 164, 93 P.3d 103. Respondent then brought this damages action under 42 U.S.C. § 1983 in the United States District Court for the District of Utah, alleging that the officers had violated the Fourth Amendment by entering his home without a warrant. See *Callahan v. Millard Cty.,* No. 2:04-CV-00952, 2006 WL 1409130 (2006).

In granting the officers' motion for summary judgment, the District Court noted that other courts had adopted the "consent-once-removed" doctrine, which permits a warrantless entry by police officers into a home when consent to enter has already been granted to an undercover officer or informant who has observed contraband in plain view. Believing that this doctrine was in tension with our intervening decision in *Georgia v. Randolph,* 547 U.S. 103, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006), the District Court concluded that "the simplest approach is to assume that the Supreme Court will ultimately reject the [consent-once-removed] doctrine and find that searches such as the one in this case are not reasonable under the Fourth Amendment." 2006 WL 1409130, at *8. The Court then held that the officers were entitled to qualified immunity because they could reasonably have believed that the consent-once-removed doctrine authorized their conduct.

On appeal, a divided panel of the Tenth Circuit held that petitioners' conduct violated respondent's Fourth Amendment rights. *Callahan v. Millard Cty.,* 494 F.3d 891, 895-899 (2007). The panel majority stated that "[t]he 'consent-once-removed' doctrine applies when an undercover officer enters a house at the express invitation of someone with authority to consent, establishes probable cause to arrest or search, and then immediately summons other officers for assistance." *Id.,* at 896. The majority took no issue with application of the doctrine when the initial consent was granted to an undercover law enforcement officer, but the majority disagreed with decisions that "broade[n] this doctrine to grant informants the same capabilities as undercover officers." *Ibid.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

The Tenth Circuit panel further held that the Fourth Amendment right that it recognized was clearly established at the time of respondent's arrest. *Id., at 898-899.* "In this case," the majority stated, "the relevant right is the right to be free in one's home from unreasonable searches and arrests." *Id., at 898.* The Court determined that, under the clearly established precedents of this Court and the Tenth Circuit, "warrantless entries into a home are per se unreasonable unless they satisfy the established exceptions." *Id., at 898-899.* In the panel's words, "the Supreme Court and the Tenth Circuit have clearly established that to allow police entry into a home, the only two exceptions to the warrant requirement are consent and exigent circumstances." *Id., at 899.* Against that backdrop, the panel concluded, petitioners could not reasonably have believed that their conduct was lawful because petitioners "knew (1) they had no warrant; (2) [respondent] had not consented to their entry; and (3) [respondent's] **815 consent to the entry of an informant could not reasonably be interpreted to extend to them." *Ibid.*

In dissent, Judge Kelly argued that "no constitutional violation occurred in this case" because, by inviting Bartholomew into his house and participating in a narcotics transaction there, respondent had compromised the privacy of the residence and had assumed the risk that Bartholomew would reveal their dealings to the police. *Id., at 903.* Judge Kelly further concluded that, even if petitioners' conduct had been unlawful, they were nevertheless entitled to qualified immunity because the constitutional right at issue-"the right to be free from the warrantless entry of police officers into one's home to effectuate an arrest after one has granted voluntary, consensual entry to a confidential informant and undertaken criminal activity giving rise to probable cause"-was not "clearly established" at the time of the events in question. *Id., at 903-904.*

As noted, the Court of Appeals followed the *Saucier* procedure. The *Saucier* procedure has been criticized by Members of this Court and by lower court judges, who have been required to apply the procedure in a great variety of cases and thus have much firsthand experience bearing on its advantages and disadvantages. Accordingly, in granting certiorari, we directed the parties to address the question whether *Saucier* should be overruled. 552 U.S. ----, 128 S.Ct. 1702, 170 L.Ed.2d 512 (2008).

II

A

[1][2] The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez,* 540 U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (KENNEDY, J., dissenting) (citing *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis deleted). Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that " 'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson v. Creighton,* 483 U.S. 635, 640, n. 2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)(per curiam).

In *Saucier,* 533 U.S. 194, 121 S.Ct. 2151, this Court

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

mandated a two-step sequence for resolving government officials' qualified immunity claims. First, a court must **816** decide whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right. 533 U.S., at 201, 121 S.Ct. 2151. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Ibid. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right. Anderson, supra, at640, 107 S.Ct. 3034.

Our decisions prior to Saucier had held that "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." County of Sacramento v. Lewis, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Saucier made that suggestion a mandate. For the first time, we held that whether "the facts alleged show the officer's conduct violated a constitutional right ... must be the initial inquiry" in every qualified immunity case. 533 U.S., at 201, 121 S.Ct. 2151 (emphasis added). Only after completing this first step, we said, may a court turn to "the next, sequential step," namely, "whether the right was clearly established." Ibid.

This two-step procedure, the Saucier Court reasoned, is necessary to support the Constitution's "elaboration from case to case" and to prevent constitutional stagnation. Ibid. "The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." Ibid.

B

[3][4] In considering whether the Saucier procedure should be modified or abandoned, we must begin with the doctrine of stare decisis. Stare decisis "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827,

111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Although "[w]e approach the reconsideration of [our] decisions ... with the utmost caution," "[s]tare decisis is not an inexorable command." State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (internal quotation marks omitted). Revisiting precedent is particularly appropriate where, as here, a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings.

[5][6] "Considerations in favor of stare decisis are at their acme in cases involving property and contract rights, where reliance interests are involved; the opposite is true in cases ... involving procedural and evidentiary rules" that do not produce such reliance. Payne, supra, at828, 111 S.Ct. 2597 (citations omitted). Like rules governing procedures and the admission of evidence in the trial courts, Saucier's two-step protocol does not affect the way in which parties order their affairs. Withdrawing from Saucier's categorical rule would not upset settled expectations on anyone's part. See United States v. Gaudin, 515 U.S. 506, 521, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995).

[7] Nor does this matter implicate "the general presumption that legislative changes should be left to Congress." Khan, supra, at20, 118 S.Ct. 275. We recognize that "considerations of stare decisis weigh heavily in the area of statutory construction, where Congress is free to **817** change this Court's interpretation of its legislation." Illinois Brick Co. v. Illinois, 431 U.S. 720, 736, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). But the Saucier rule is judge made and implicates an important matter involving internal Judicial Branch operations. Any change should come from this Court, not Congress.

[8] Respondent argues that the Saucier procedure should not be reconsidered unless we conclude that its justification was "badly reasoned" or that the rule has proved to be "unworkable," see Payne, supra, at827, 111 S.Ct. 2597, but those standards, which are appropriate when a constitutional or statutory precedent is challenged, are out of place in the present context. Because of the basis and the nature of the Saucier two-step protocol, it is

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

sufficient that we now have a considerable body of new experience to consider regarding the consequences of requiring adherence to this inflexible procedure. This experience supports our present determination that a mandatory, two-step rule for resolving all qualified immunity claims should not be retained.

Lower court judges, who have had the task of applying the *Saucier* rule on a regular basis for the past eight years, have not been reticent in their criticism of *Saucier*'s "rigid order of battle." See, *e.g., Purtell v. Mason*, 527 F.3d 615, 622 (C.A.7 2008) ("This 'rigid order of battle' has been criticized on practical, procedural, and substantive grounds"); Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U.L.Rev. 1249, 1275, 1277 (2006) (referring to *Saucier*'s mandatory two-step framework as "a new and mischievous rule" that amounts to "a puzzling misadventure in constitutional dictum"). And application of the rule has not always been enthusiastic. See *Higazy v. Templeton*, 505 F.3d 161, 179, n. 19 (C.A.2 2007) ("We do not reach the issue of whether [plaintiff's] Sixth Amendment rights were violated, because principles of judicial restraint caution us to avoid reaching constitutional questions when they are unnecessary to the disposition of a case"); *Cherrington v. Skeeter*, 344 F.3d 631, 640 (C.A.6 2003) ("[I]t ultimately is unnecessary for us to decide whether the individual Defendants did or did not heed the Fourth Amendment command ... because they are entitled to qualified immunity in any event"); *Pearson v. Ramos*, 237 F.3d 881, 884 (C.A.7 2001) ("Whether [the *Saucier*] rule is absolute may be doubted").

Members of this Court have also voiced criticism of the *Saucier* rule. See *Morse v. Frederick*, 551 U.S. ----, ----, 127 S.Ct. 2618, 2642, 168 L.Ed.2d 290 (2007) (BREYER, J., concurring in judgment in part and dissenting in part) ("I would end the failed *Saucier* experiment now"); *Bunting v. Mellen*, 541 U.S. 1019, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004) (STEVENS, J., joined by GINSBURG and BREYER, JJ., respecting denial of certiorari) (criticizing the "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity"); *Id.*, at 1025, 124 S.Ct. 1750 (SCALIA, J., joined by Rehnquist, C.J., dissenting from denial of certiorari) ("We should either make clear that

constitutional determinations are *not* insulated from our review ... or else drop any pretense at requiring the ordering in every case" (emphasis in original)); *Brosseau v. Haugen*, 543 U.S. 194, 201-202, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (BREYER, J., joined by SCALIA and GINSBURG, JJ., concurring) (urging Court to reconsider *Saucier*'s "rigid 'order of battle,' " which "requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the **818 decision (*e.g.*, qualified immunity) that will satisfactorily resolve the case before the court"); *Saucier*, 533 U.S., at 210, 121 S.Ct. 2151 (GINSBURG, J., concurring in judgment) ("The two-part test today's decision imposes holds large potential to confuse").

[9] Where a decision has "been questioned by Members of the Court in later decisions and [has] defied consistent application by the lower courts," these factors weigh in favor of reconsideration. *Payne*, 501 U.S., at 829-830, 111 S.Ct. 2597; see also *Crawford v. Washington*, 541 U.S. 36, 60, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Collectively, the factors we have noted make our present reevaluation of the *Saucier* two-step protocol appropriate.

III

[10] On reconsidering the procedure required in *Saucier,* we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

A

Although we now hold that the *Saucier* protocol should not be regarded as mandatory in all cases, we continue to recognize that it is often beneficial. For one thing, there are cases in which there would be little if any conservation of judicial resources to be had by beginning and ending with a discussion of the "clearly established" prong. "[I]t often may be difficult to decide whether a right is clearly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

established without deciding precisely what the constitutional right happens to be." *Lyons v. Xenia,* 417 F.3d 565, 581 (C.A.6 2005) (Sutton, J., concurring). In some cases, a discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all. In addition, the *Saucier* Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.

B

At the same time, however, the rigid *Saucier* procedure comes with a price. The procedure sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case. There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right. District courts and courts of appeals with heavy caseloads are often understandably unenthusiastic about what may seem to be an essentially academic exercise.

[11] Unnecessary litigation of constitutional issues also wastes the parties' resources. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell,* 472 U.S., at 526, 105 S.Ct. 2806 (emphasis deleted). *Saucier'*s two-step protocol "disserve[s] the purpose of qualified immunity" when it "forces the parties to endure additional burdens of suit-such as the costs of litigating constitutional questions and delays attributable to resolving them-when the suit otherwise could be disposed of more readily." Brief for Nat. Assn. of Criminal Defense Lawyers as *Amicus Curiae* 30.

*819 Although the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development. For one thing, there are cases in which the constitutional question is so fact-bound that the decision provides little guidance for future cases. See *Scott v. Harris,* 550 U.S.

372, 388, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (BREYER, J., concurring) (counseling against the *Saucier* two-step protocol where the question is "so fact dependent that the result will be confusion rather than clarity"); *Buchanan v. Maine,* 469 F.3d 158, 168 (C.A.1 2006) ("We do not think the law elaboration purpose will be well served here, where the Fourth Amendment inquiry involves a reasonableness question which is highly idiosyncratic and heavily dependent on the facts").

A decision on the underlying constitutional question in a § 1983 damages action or a *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),[FN1] action may have scant value when it appears that the question will soon be decided by a higher court. When presented with a constitutional question on which this Court had just granted certiorari, the Ninth Circuit elected to "bypass *Saucier'*s first step and decide only whether [the alleged right] was clearly established." *Motley v. Parks,* 432 F.3d 1072, 1078, and n. 5 (2005) (en banc). Similar considerations may come into play when a court of appeals panel confronts a constitutional question that is pending before the court en banc or when a district court encounters a constitutional question that is before the court of appeals.

FN1. See *Harlow v. Fitzgerald,* 457 U.S. 800, 818, and n. 30, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (noting that the Court's decisions equate the qualified immunity of state officials sued under 42 U.S.C. § 1983 with the immunity of federal officers sued directly under the Constitution).

A constitutional decision resting on an uncertain interpretation of state law is also of doubtful precedential importance. As a result, several courts have identified an "exception" to the *Saucier* rule for cases in which resolution of the constitutional question requires clarification of an ambiguous state statute. *Egolf v. Witmer,* 526 F.3d 104, 109-111 (C.A.3 2008); accord, *Tremblay v. McClellan,* 350 F.3d 195, 200 (C.A.1 2003); *Ehrlich v. Glastonbury,* 348 F.3d 48, 57-60 (C.A.2 2003). Justifying the decision to grant qualified immunity to the defendant without first resolving, under *Saucier'*s first prong, whether the defendant's conduct violated the

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

Constitution, these courts have observed that *Saucier's* "underlying principle" of encouraging federal courts to decide unclear legal questions in order to clarify the law for the future "is not meaningfully advanced ... when the definition of constitutional rights depends on a federal court's uncertain assumptions about state law." *Egolf, supra,* at 110; accord, *Tremblay, supra,* at200;*Ehrlich, supra,* at 58.

When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify. See *Lyons, supra,* at 582 (Sutton, J., concurring); *Kwai Fun Wong v. United States,* 373 F.3d 952, 957 (C.A.9 2004); *Mollica v. Volker,* 229 F.3d 366, 374 (C.A.2 2000). Accordingly, several courts have recognized that the two-step inquiry "is an uncomfortable exercise where ... the answer [to] whether there was a violation may depend on a kaleidoscope of facts not yet fully developed" and have suggested that "[i]t may be that *Saucier* was not strictly intended to cover" this situation. **\*820***Dirrane v. Brookline Police Dept.,* 315 F.3d 65, 69-70 (C.A.1 2002); see also *Robinette v. Jones,* 476 F.3d 585, 592, n. 8 (C.A.8 2007) (declining to follow *Saucier* because "the parties have provided very few facts to define and limit any holding" on the constitutional question).

There are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking. The lower courts sometimes encounter cases in which the briefing of constitutional questions is woefully inadequate. See *Lyons,* 417 F.3d, at 582 (Sutton, J., concurring) (noting the "risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented"); *Mollica, supra,* at374.

Although the *Saucier* rule prescribes the sequence in which the issues must be discussed by a court in its opinion, the rule does not-and obviously cannot-specify the sequence in which judges reach their conclusions in their own internal thought processes. Thus, there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all. In

such situations, there is a risk that a court may not devote as much care as it would in other circumstances to the decision of the constitutional issue. See *Horne v. Coughlin,* 191 F.3d, 244, 247 (C.A.2 1999) ("Judges risk being insufficiently thoughtful and cautious in uttering pronouncements that play no role in their adjudication"); Leval 1278-1279.

Rigid adherence to the *Saucier* rule may make it hard for affected parties to obtain appellate review of constitutional decisions that may have a serious prospective effect on their operations. Where a court holds that a defendant committed a constitutional violation but that the violation was not clearly established, the defendant may face a difficult situation. As the winning party, the defendant's right to appeal the adverse holding on the constitutional question may be contested. See *Bunting,* 541 U.S., at 1025, 124 S.Ct. 1750 (SCALIA, J., dissenting from denial of certiorari) ("The perception of unreviewability undermines adherence to the sequencing rule we ... created" in Saucier); [FN2] see also *Kalka v. Hawk,* 215 F.3d 90, 96, n. 9 (C.A.D.C.2000) (noting that "[n]ormally, a party may not appeal from a favorable judgment" and that the Supreme Court "has apparently never granted the certiorari petition of a party who prevailed in the appellate court"). In cases like *Bunting,* the "prevailing" defendant faces an unenviable choice: "compl[y] with the lower court's advisory dictum without opportunity to seek appellate [or certiorari] review," or "def[y] the views of the lower court, adher[e] to practices that have been declared illegal, and thus invit[e] new suits" and potential "punitive damages." *Horne, supra,* at247-248.

FN2. In *Bunting,* the Court of Appeals followed the *Saucier* two-step protocol and first held that the Virginia Military Institute's use of the word "God" in a "supper roll call" ceremony violated the Establishment Clause, but then granted the defendants qualified immunity because the law was not clearly established at the relevant time. *Mellen v. Bunting,* 327 F.3d 355, 365-376 (C.A.4 2003), cert. denied, 541 U.S. 1019, 124 S.Ct. 1750, 158 L.Ed.2d 636 (2004). Although they had a judgment in their favor below, the defendants asked this Court to review the adverse constitutional ruling. Dissenting from the denial of certiorari, Justice SCALIA, joined by Chief

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

Justice Rehnquist, criticized "a perceived procedural tangle of the Court's own making." 541 U.S., at 1022, 124 S.Ct. 1750. The "tangle" arose from the Court's " 'settled refusal' to entertain an appeal by a party on an issue as to which he prevailed" below, a practice that insulates from review adverse merits decisions that are "locked inside" favorable qualified immunity rulings. Id., at 1023, 1024, 124 S.Ct. 1750.

**\*821** Adherence to *Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the "older, wiser judicial counsel 'not to pass on questions of constitutionality ... unless such adjudication is unavoidable.' " *Scott,* 550 U.S., at 388, 127 S.Ct. 1769 (BREYER, J., concurring) (quoting *Spector Motor Service, Inc. v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)); see *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of").

In other analogous contexts, we have appropriately declined to mandate the order of decision that the lower courts must follow. For example, in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we recognized a two-part test for determining whether a criminal defendant was denied the effective assistance of counsel: The defendant must demonstrate (1) that his counsel's performance fell below what could be expected of a reasonably competent practitioner; and (2) that he was prejudiced by that substandard performance. *Id.,* at 687, 104 S.Ct. 2052. After setting forth and applying the analytical framework that courts must use in evaluating claims of ineffective assistance of counsel, we left it to the sound discretion of lower courts to determine the order of decision. *Id.,* at 697, 104 S.Ct. 2052 ("Although we have discussed the performance component of an ineffectiveness claim prior to the prejudice component, there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one").

In *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), we created an exception to the exclusionary rule when officers reasonably rely on a facially valid search warrant. Id., at 913, 104 S.Ct. 3405. In that context, we recognized that a defendant challenging a search will lose if either: (1) the warrant issued was supported by probable cause; or (2) it was not, but the officers executing it reasonably believed that it was. Again, after setting forth and applying the analytical framework that courts must use in evaluating the good-faith exception to the Fourth Amendment warrant requirement, we left it to the sound discretion of the lower courts to determine the order of decision. Id., at 924, 925, 104 S.Ct. 3405 ("There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated").

This flexibility properly reflects our respect for the lower federal courts that bear the brunt of adjudicating these cases. Because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking will best facilitate the fair and efficient disposition of each case.

C

Any misgivings concerning our decision to withdraw from the mandate set forth in *Saucier* are unwarranted. Our decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases. Moreover, the development of constitutional law is by no means entirely dependent **\*822** on cases in which the defendant may seek qualified immunity. Most of the constitutional issues that are presented in § 1983 damages actions and *Bivens* cases also arise in cases in which that defense is not available, such as criminal cases and § 1983 cases against a municipality, as well as § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages. See *Lewis,* 523 U.S., at 841, n. 5, 118 S.Ct.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21 Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

1708 (noting that qualified immunity is unavailable "in a suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion").

We also do not think that relaxation of *Saucier*'s mandate is likely to result in a proliferation of damages claims against local governments. Compare Brief for Nat. Assn. of Counties et al., as *Amici Curiae* 29, 30 ("[T]o the extent that a rule permitting courts to bypass the merits makes it more difficult for civil rights plaintiffs to pursue novel claims, they will have greater reason to press custom, policy, or practice [damages] claims against local governments"). It is hard to see how the *Saucier* procedure could have a significant effect on a civil rights plaintiff's decision whether to seek damages only from a municipal employee or also from the municipality. Whether the *Saucier* procedure is mandatory or discretionary, the plaintiff will presumably take into account the possibility that the individual defendant will be held to have qualified immunity, and presumably the plaintiff will seek damages from the municipality as well as the individual employee if the benefits of doing so (any increase in the likelihood of recovery or collection of damages) outweigh the litigation costs.

Nor do we think that allowing the lower courts to exercise their discretion with respect to the *Saucier* procedure will spawn "a new cottage industry of litigation ... over the standards for deciding whether to reach the merits in a given case." Brief for Nat. Assn. of Counties et al. as *Amici Curiae* 29, 30. It does not appear that such a "cottage industry" developed prior to *Saucier,* and we see no reason why our decision today should produce such a result.

IV

[12][13][14] Turning to the conduct of the officers here, we hold that petitioners are entitled to qualified immunity because the entry did not violate clearly established law. An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment. See *Anderson, 483 U.S., at 641, 107 S.Ct. 3034.* This inquiry turns on the "objective legal reasonableness of the action, assessed in

light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (internal quotation marks omitted); see *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful" (internal quotation marks omitted)).

When the entry at issue here occurred in 2002, the "consent-once-removed" doctrine had gained acceptance in the lower courts. This doctrine had been considered by three Federal Courts of Appeals and two State Supreme Courts starting in the early 1980's. See, *e.g.,United States v. Diaz,* 814 F.2d 454, 459 (CA7), cert. denied, 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *United States v. Bramble,* 103 F.3d 1475 (C.A.9 1996); *United States v. Pollard,* 215 F.3d 643, 648-649 (CA6), cert. denied, 531 U.S. 999, 121 S.Ct. 498, 148 L.Ed.2d 469 (2000); *823State v. Henry,* 133 N.J. 104, 627 A.2d 125 (1993); *State v. Johnston,* 184 Wis.2d 794, 518 N.W.2d 759 (1994). It had been accepted by every one of those courts. Moreover, the Seventh Circuit had approved the doctrine's application to cases involving consensual entries by private citizens acting as confidential informants. See *United States v. Paul,* 808 F.2d, 645, 648 (1986). The Sixth Circuit reached the same conclusion after the events that gave rise to respondent's suit, see *United States v. Yoon,* 398 F.3d 802, 806-808, cert. denied, 546 U.S. 977, 126 S.Ct. 548, 163 L.Ed.2d 460 (2005), and prior to the Tenth Circuit's decision in the present case, no court of appeals had issued a contrary decision.

[15] The officers here were entitled to rely on these cases, even though their own Federal Circuit had not yet ruled on "consent-once-removed" entries. The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law. Police officers are entitled to rely on existing lower court cases without facing personal liability for their actions. In *Wilson,* we explained that a Circuit split on the relevant issue had developed after the events that gave rise to suit and concluded that "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." 526 U.S., at 618, 119 S.Ct. 1692. Likewise, here, where the divergence of views on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal. Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588
(Cite as: 129 S.Ct. 808)

consent-once-removed doctrine was created by the decision of the Court of Appeals in this case, it is improper to subject petitioners to money damages for their conduct.

Because the unlawfulness of the officers' conduct in this case was not clearly established, petitioners are entitled to qualified immunity. We therefore reverse the judgment of the Court of Appeals.

*It is so ordered.*

U.S.,2009.
Pearson v. Callahan
129 S.Ct. 808, 172 L.Ed.2d 565, 77 USLW 4068, 09 Cal.
Daily Op. Serv. 755, 2009 Daily Journal D.A.R. 922, 21
Fla. L. Weekly Fed. S 588

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



567 F.3d 54
(Cite as: 567 F.3d 54)

United States Court of Appeals,
Second Circuit.
John KELSEY and Timothy Wright, both individually
and on behalf of a class of others similarly situated,
Plaintiffs-Appellees,
v.
The COUNTY OF SCHOHARIE, John S. Bates Jr.,
both individually and his official capacity as Sheriff of
the County of Schoharie, and Jim Hazzard, both
individually and in his capacity as Administrator of the
Schoharie County Jail, Defendants-Appellants.
**Docket No. 07-0893-cv.**

Argued: Oct. 3, 2008.
Decided: May 22, 2009.

**Background:** Inmates brought action against county,
sheriff, and other defendants, seeking an injunction and
damages on ground that claiming that the clothing
exchange procedure for newly admitted inmates at county
jail constituted a strip search violative of the Fourth
Amendment when executed without reasonable suspicion.
The United States District Court for the Northern District
of New York, Kahn, J., 2007 WL 603406, denied
defendants' motion for summary judgment, and they
appealed.

**Holding:** The Court of Appeals, Miner, Circuit Judge,
held that process for the exchange of personal clothing for
prison clothing under the observation of a corrections
officer did not fall within the prohibitions relating to strip
searches.

Reversed and remanded with instructions.

Sotomayor, Circuit Judge, filed dissenting opinion.

West Headnotes

**[1] Federal Courts 170B** 🔑 **574**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(C) Decisions Reviewable
      170BVIII(C)2 Finality of Determination
        170Bk572 Interlocutory Orders Appealable
          170Bk574 k. Other Particular Orders.
Most Cited Cases
An interlocutory appeal from a denial of summary
judgment is available to assert that an immunity defense is
established as a matter of law. 28 U.S.C.A. § 1291.

**[2] Civil Rights 78** 🔑 **1376(2)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and
Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(2) k. Good Faith and
Reasonableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
Under the doctrine of qualified immunity, government
officials performing discretionary functions generally are
shielded from liability for civil damages insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would
have known. 42 U.S.C.A. § 1983.

**[3] Civil Rights 78** 🔑 **1376(1)**

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and
Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(1) k. In General. Most Cited Cases

**Federal Civil Procedure 170A** 🔑 **2491.5**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)2 Particular Cases
            170Ak2491.5 k. Civil Rights Cases in
General. Most Cited Cases
When the facts, viewed in light most favorable to the §
1983 plaintiff, do not demonstrate that an officer's conduct
violated a constitutional right, the court need not further
pursue the qualified immunity inquiry, and the officer is
entitled to summary judgment. 42 U.S.C.A. § 1983.

[4] Searches and Seizures 349 🔑 55

349 Searches and Seizures
   349I In General
      349k53 Scope, Conduct, and Duration of
Warrantless Search
         349k55 k. Skin, Strip, and Body Searches. Most
Cited Cases
Fourth Amendment requires an individualized reasonable
suspicion that a misdemeanor arrestee is concealing
weapons or other contraband based on the crime charged,
the particular characteristics of the arrestee and/or the
circumstances of the arrest before he may be lawfully
subjected to a strip search. U.S.C.A. Const.Amend. 4.

[5] Searches and Seizures 349 🔑 16

349 Searches and Seizures
   349I In General
      349k13 What Constitutes Search or Seizure
         349k16 k. Observation; Items in Plain View.
Most Cited Cases

Searches and Seizures 349 🔑 55

349 Searches and Seizures
   349I In General
      349k53 Scope, Conduct, and Duration of
Warrantless Search
         349k55 k. Skin, Strip, and Body Searches. Most
Cited Cases
Incidental observation of the body, including genitals, of

a male arrestee during a required clothing exchange during
which corrections officer stood in front of arrestee during
the brief period when he removed his street clothes and
put on the jail uniform, was not an unreasonable search
under the Fourth Amendment; process for the exchange of
personal clothing for prison clothing under the observation
of a corrections officer did not fall within the prohibitions
relating to strip searches since inmates were not required
to display or manipulate their body parts in any way, and
since methods were available to them to protect viewing
of their private parts in the event they desired to make use
of such methods. U.S.C.A. Const.Amend. 4.

*55Bruce Menken, Jason Rozger, Beranbaum Menken
Ben-Asher & Bierman, LLP, New York, NY, for
Plaintiffs-Appellees.

E. Robert Keach III, Law Offices of Elmer Robert Keach
III, P.C., Amsterdam, NY, for Plaintiffs-Appellees.

Gregg Johnson, Girvin & Ferlazzo, P.C., Albany, NY, for
Defendants-Appellants.

Before: JACOBS, Chief Judge, and MINER and
SOTOMAYOR, Circuit Judges.

Judge SOTOMAYOR dissents in a separate opinion.

*56MINER, Circuit Judge:

## INTRODUCTION

Defendants-appellants John S. Bates Jr., Sheriff of
Schoharie County, New York, and Lt. Jim Hazzard,
Administrator of the Schoharie County Jail (together, the
"defendants") appeal from a Decision and Order entered
in the United States District Court for the Northern
District of New York (Kahn, J.) denying their motion for
summary judgment in an action brought against them by
plaintiffs-appellees John Kelsey and Timothy Wright
(together, the "plaintiffs"). *Kelsey v. County of Schoharie,
No. 1:04-CV-299, 2007 WL 603406 (N.D.N.Y. Feb.21,
2007)*. The County of Schoharie is also named as a
defendant in the action and joined in the motion. The

567 F.3d 54
 (Cite as: 567 F.3d 54)

plaintiffs seek an injunction and damages, claiming that the clothing exchange procedure for newly admitted inmates at the Schoharie County Jail constitutes a strip search violative of the Fourth Amendment when executed without reasonable suspicion. The defendants, sued in their official and individual capacities, base their motion for summary judgment, *inter alia,* on the defense of qualified immunity. The learned District Court, identifying a possible constitutional violation, found "material facts" in dispute and therefore rejected the defense of qualified immunity, with leave to reassert the defense "at the proper time." *Kelsey,* 2007 WL 603406, at *8. For the reasons that follow, we reverse the Decision and Order of the District Court and remand with instructions to dismiss the action.

## BACKGROUND

I. The Clothing Exchange According To Defendants

The Schoharie County Jail is operated by the Schoharie County Sheriff's Department under the direction of Sheriff Bates. Day-to-day responsibility for the facility is vested in Lt. Hazzard as jail administrator. Bates and Hazzard have established and implemented procedures for the admission of male inmates to the facility and state that they have familiarized and trained all subordinate personnel at the facility in these procedures. Included in the intake procedure is a clothing exchange, whereby newly admitted inmates are issued distinctive facility clothing in exchange for their street clothes. This clothing exchange requirement is applied only to those male inmates who are not expected to make bail and therefore are to be confined in a housing unit at the jail. According to Sheriff Bates,

[t]he purposes of the clothing issue include, ensuring that each inmate has clean clothing free of infestation and to make sure that inmates are clearly identifiable and can be readily distinguished from visitors, members of the public and staff. For some inmates, the facility-issued clothing is better than the clothing and personal care items they have outside the facility and thus may positively impact their state of mind while being housed at the [jail]. The issuance of clothing is commonly referred to as the clothing exchange process.

Before the clothing exchange, a new inmate undergoes a booking procedure. He is first transported from a sally port to a holding area containing two holding cells next to a control room and booking room. In the holding area, the inmate is required to remove his coat (if any) and empty his pockets. Thereafter, he is subjected to a "pat frisk" and sometimes to a search by a hand-held metal detector, all while the inmate is fully clothed. According to the Sheriff, no other type of search is authorized during the intake period. The inmate then is placed in a holding cell within the holding area until the admitting corrections**57** officer is ready to proceed with the booking process.

The inmate is next required to sit beside a window in the holding area. The booking room is on the other side of the window, through which the inmate is interviewed by the corrections officer. The officer enters the answers to his questions into a computer. The questions pertain to such matters as pedigree, medical information, scars and tattoos. Next, the corrections officer in charge of the booking procedure returns to the holding area, where he photographs and fingerprints the inmate. The inmate remains in his street clothes throughout the booking process.

It is only after the booking process is completed that the clothing exchange takes place for those inmates who are to be confined in one of the housing units. Although there is no written policy for the clothing exchange itself, the defendants insist that they have established a protocol for the clothing exchange and have instructed all jail personnel in the protocol as follows: A corrections officer produces in the holding area a mesh property bag into which the inmate is to place his clothes. The officer instructs the inmate to stand on one side of a 42" x 48" masonry half-wall with the officer on the other side. The officer then lays out on the half-wall the jail uniform, a 48" long white towel, soap and other personal items. The inmate is then instructed to disrobe and place his street clothes into the mesh bag, which is held open by the officer on the other side of the half-wall. The inmate may use the towel for privacy as he disrobes preparatory to taking a required shower and dressing in the jail uniform.

While the inmate is showering, the officer takes the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

inmate's street clothes to a property room across the hallway from the holding area. There, the officer inspects the clothing for contraband, tags it, and sends it to the laundry room for washing. When he returns to the holding area, he escorts the newly clothed inmate to the appropriate housing unit. The protocol does not call for the officer to conduct a personal search or body inspection or to observe the inmate taking a shower or getting dressed. Although there is no written policy specifically addressed to the clothing exchange procedure, there is a written policy entitled "Inmate Processing." Within that policy is a provision for medical screening which provides: "A visual analysis of the inmate will be conducted throughout the admission process."

A written policy for strip searches and body cavity searches has been established at the jail under the title "Control of and Search for Contraband." It provides that "[a] 'strip/strip frisk search' shall not be routinely conducted." Such a search is allowed only "[w]here an officer has made a determination that there is reasonable suspicion to believe that the inmate should be searched" or "[w]here an officer has reasonable suspicion to believe an inmate is hiding contraband on his person and/or the inmate is in possession of contraband." The policy provides that "[w]hen inmates cooperate in the conduct of a strip/strip frisk search, the inmate's body will not be touched." Body cavity searches in the jail "[m]ay be authorized only in circumstances where there are compelling reasons to believe that the inmate(s) to be searched have secreted in a rectal/vaginal cavity contraband, the nature of which constitutes a clear threat to the safety and security of the facility and/or a threat to the safety and well being of any person." Sheriff Bates "do[es] not recall a single occasion when a [b]ody cavity search was conducted on an inmate during [his] tenure as Sheriff."

Sheriff Bates has put forth the proposition that "the clothing exchange procedure *58 is not intended as a personal search of the inmate but rather a brief administrative process that precedes newly-admitted inmates ['] transport to a housing unit." He has represented, "[u]pon information and belief," that "inmates are never instructed to squat, bend, turn, open their mouth, manipulate their body, or in any other manner expose themselves for a personal search or inspection" during the clothing exchange. Jail Administrator Hazzard

avers that corrections officers at the jail have been trained to perform the prescribed clothing exchange procedure and that "[t]he clothing exchange is simply intended to get inmates into the jail uniform and secure their street clothing on their way to housing." However, he is aware of three occasions when the prescribed procedure was not followed: On one occasion, the corrections officer left the holding area and left the inmate alone to change out of his street clothes and into his prison clothes and to shower. On the other two occasions, the corrections officer caused the clothing exchange to take place in the holding cell instead of allowing the inmate the benefit of the privacy afforded by the masonry half-wall.

II. The Clothing Exchange According To Plaintiffs

Plaintiff Kelsey arrived at the Schoharie County Jail on October 16, 2002, having been transported there from the Albany County Jail, where he worked as a corrections officer. He had been arrested for a civil violation of the Family Court Act in connection with a child support matter. He underwent the booking procedure, including photographing and fingerprinting, before the required clothing exchange. He testified at his deposition that a corrections officer laid out the jail uniform on a bench in front of the half-wall. He proceeded to take off his street clothes in the open booking area, as directed, in order to put on the jail uniform. Kelsey asked the officer if he had to remove his underwear, and the officer replied: "Yes. Everything." The officer stood directly in front of Kelsey during the clothing exchange, and Kelsey placed his street clothes into a clear garbage bag at the request of the officer.

In his deposition, Kelsey stated that he asked the officer during the clothing exchange: "Do I have to do this here?" and that the officer answered: "Yes, you do." Kelsey testified that the officer's "eyes were looking up and down my body, so I assume he saw my genitals." Kelsey found the entire process "embarrassing" and "[h]umiliating." Kelsey testified that during the clothing exchange he was not prevented from turning around, from going behind the half-wall or from using the towel or the bag to obscure the officer's view of his body. He also stated that he was not required to lift his arms, to open his mouth, to expose his buttocks or to manipulate any part of his body. He did not indicate that he was touched by the officer in any way.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

The Cobleskill Police Department brought plaintiff Wright to the Schoharie County Jail at about 3:30 a.m. on September 5, 2003, after Wright's arrest for driving while intoxicated. In his deposition, Wright testified that, following his interview at the jail, he was placed in a holding cell with the cell door open. An officer then brought him a jail uniform, a white towel, and a mesh bag for his street clothes. Wright sat on a bench in the cell and removed his street clothing, which he placed in the bag. He then proceeded to take a shower as directed, taking the towel with him. He returned to the holding cell with the towel, got dressed in the jail uniform and was escorted to a housing unit. According to Wright, a corrections officer stood in front of him as he removed his street clothes (a process that took one **59** minute) and placed them in the mesh bag provided. When asked in what direction he was facing as he undressed, Wright testified: "At somewhat of an angle to [the officer], but I can't recall 100 percent which way I was facing. It was like sort of facing towards the officer." Wright also testified that when he dressed in the holding cell after the shower, no one was present in the holding area. In response to a question relating to the mental and emotional stress allegedly suffered, Wright described his experience as "rather unpleasant" and stated: "[I]t was, you know, just a rather humiliating kind of-shameful kind of, just being naked in front of at least one other individual and possibly in the view of others."

Plaintiff Wright's description of the deviations from the clothing exchange protocol is consistent with the deposition testimony of Joseph Kenyon, a corrections officer employed at the Schoharie County Jail. According to Officer Kenyon, inmates are required to stand in front of him and face him during the entire clothing exchange. He watches the inmates as they remove their clothing, the disrobing takes place in the "holding cell where the inmate is at," and there is no option to disrobe in private.

III. The Motion for Summary Judgment and the Decision of the District Court

Relying upon affidavits as well as depositions and other materials obtained during discovery, the defendants moved for summary judgment in the District Court. They contended that the clothing exchange procedure did not entail a strip search, that inmates were allowed to preserve their privacy in various ways during the exchange, and that established Jail policy permits a strip search only on reasonable suspicion. Defendants also raised the defense of qualified immunity in the motion. Plaintiffs responded that the clothing exchange process requires a visual examination of each inmate during disrobing and that such examination constitutes an unreasonable search for Fourth Amendment purposes when conducted without reasonable suspicion.

In a written opinion denying the motion for summary judgment,[FN1] the District Court stated as follows:

> FN1. In the same opinion, the District Court granted plaintiff's motion for class certification. *Kelsey,* 2007 WL 603406, at *14.

Defendants have not met their burden to prove that there is no issue of material fact as to whether [the jail's] policies and practices require COs to observe inmates as they remove their street clothes. However, a question remains: if a CO w[ere] required to observe an inmate undress, would this procedure constitute an unreasonable search under the Fourth Amendment to the United States Constitution?
*Kelsey,* 2007 WL 603406, at *5.

Consistently characterizing the clothing exchange as the "Exchange/Strip Search Process" throughout its opinion, the District Court examined the record and concluded that the observation of a newly admitted inmate in the process of disrobing is a search for contraband. *Id.* at *6. The District Court also noted the defendants' contention that the presence of a corrections officer serves as a deterrent to the transfer or destruction of contraband. *Id.* at *6. The District Court concluded: "If this admission is accurate, it can mean only one thing: that the exchange/strip search process is meant to serve as a search for contraband-even when there is **60** no reasonable suspicion to do so." *Id.* at *7. As the District Court correctly noted, a strip search without reasonable suspicion is prohibited by our precedent. However, the court made no final pronouncement on the constitutionality of the search it had identified: "[T]his Court cannot grant summary judgment to the Defendants while there is credible conflicting

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

evidence in the record regarding the nature of the CO's observation of inmates as they disrobe." *Id.* The District Court thus did not find that the challenged searches were unreasonable. The court did find, however, that the defendants were amenable to suit individually "[a]s a consequence of their involvement in the maintenance of [the jail's] policies and practices." *Id.* Finally, the court briefly addressed the qualified immunity defense as follows:

There remains a dispute regarding material facts related to the constitutionality of the exchange/strip search process. As a result, it would be premature to determine whether Defendants Bates and Hazzard are responsible for violating clearly established constitutional law or are immune from suit under the qualified immunity doctrine. Defendants Bates and Hazzard may renew their defense at the proper time.

*Id.* at *8.

## ANALYSIS

### I. Of Appealability and Qualified Immunity

It is the District Court's denial of qualified immunity that permits the defendants to bring this appeal to us as an exception to the rule of finality. *See Mitchell v. Forsyth, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)* ("[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of *28 U.S.C. § 1291* notwithstanding the absence of a final judgment.") Interlocutory appeal in this sort of case "is not permitted if the district court's denial of summary judgment for qualified immunity rests on a finding that there were material facts in dispute." *Genas v. N.Y. Dep't of Corr. Servs., 75 F.3d 825, 830 (2d Cir.1996).* The Supreme Court teaches that "a district court's summary judgment order that, though entered in a 'qualified immunity' case, determines only a question of 'evidence sufficiency,' *i.e.,* which facts a party may, or may not, be able to prove at trial ... is not appealable." *Johnson v. Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).*

[1] Despite the bar to appealability that factual issues may provide in the qualified immunity context, we have observed that

as long as the defendant can support an immunity defense on stipulated facts, facts accepted for purposes of the appeal, or the plaintiff's version of the facts that the district court deemed available for jury resolution, an interlocutory appeal is available to assert that an immunity defense is established as a matter of law.

*Salim v. Proulx, 93 F.3d 86, 90 (2d Cir.1996).* We accept the plaintiffs' version of the facts in making our determination herein, as will be seen. Accordingly, we take jurisdiction over the district court's denial of defendants' motion for summary judgment to the extent that the motion is grounded in qualified immunity, and our review is *de novo. See Jones v. Parmley, 465 F.3d 46, 55 (2d Cir.2006).*

[2] Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional*61 rights of which a reasonable person would have known." *Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).* In assessing an officer's eligibility for the shield, "the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Wilson v. Layne, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).* Qualified immunity is also said to protect the government officer "if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995)* (citing *Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)); see also Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir.2000).*

### II. Of the Threshold Inquiry

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

Until the issuance of the Supreme Court's opinion in *Pearson v. Callahan,* --- U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), the following threshold inquiry was mandatory:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the inquiry, do the facts alleged show the officers' conduct violated a constitutional right. This must be the initial inquiry.

> ....

> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.

*Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). While it is now true "that the *Saucier* protocol should not be regarded as mandatory in all cases, [the Supreme Court] continue[s] to recognize that it is often beneficial." *Pearson,* 129 S.Ct. at 818. Accordingly, we are no longer *required* to make a "threshold inquiry" as to the violation of a constitutional right in a qualified immunity context, but we are free to do so. *Id.* at 821. The inquiry is said to be appropriate in those cases where "discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all." *Id.* at 818. This is such a case. The Supreme Court's current teaching is that "the *Saucier* Court was certainly correct in noting that the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.*

The development of constitutional precedent is especially important here, where (1) this Court has not spoken on the issue of the constitutionality of clothing exchange procedures in jails although the issue has been presented in district courts in this circuit, *see, e.g., Marriott v. County of Montgomery,* 227 F.R.D. 159, 169-70 (N.D.N.Y.2005) (holding that a jail facility's "change-out"

procedure was a "strip search" and in violation of the Fourth Amendment to the Constitution); *see also Williams v. County of Niagara,* No. 06-CV-291A, 2008 WL 4501918, at *2 (W.D.N.Y. Sept.29, 2008) (involving a class action certification question where the defendants argued, *inter alia,* that a " 'clothing change-out' " procedure in a jail "does not constitute a strip search and is constitutional"); and (2) the constitutionality of clothing exchange procedures in jails may never be developed if this Court were to dispose of all challenges relating to the procedures simply because the procedure **\*62** is not "clearly established" as a "strip search" violative of the Fourth Amendment.

[3] It is also said that addressing the constitutional issue first may not only avoid the possibility of drawn-out litigation and the imposition of unwarranted liability, but may also serve to clarify official conduct standards. *See Sound Aircraft Servs., Inc. v. Town of E. Hampton,* 192 F.3d 329, 334 (2d Cir.1999). We think that all these purposes are served by undertaking the constitutional inquiry first in this case. When the facts, viewed in light most favorable to the plaintiff, do not demonstrate that an officer's conduct violated a constitutional right, the court need not further pursue the qualified immunity inquiry, "and the officer is entitled to summary judgment." *Gilles v. Repicky,* 511 F.3d 239, 244 (2d Cir.2007).

III. Of Strip Searches and the Fourth Amendment

[4] In undertaking our threshold constitutional inquiry, we first take note of our long-standing precedent covering strip searches of those arrested for misdemeanors:

> The Fourth Amendment requires an individualized "reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee and/or the circumstances of the arrest" before [he] may be lawfully subjected to a strip search.

*Hartline v. Gallo,* 546 F.3d 95, 100 (2d Cir.2008) (citing *Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986)) (first alteration in original); *see also Walsh v. Franco,* 849 F.2d 66, 68-69 (2d Cir.1988). The written policy of the

567 F.3d 54
(Cite as: 567 F.3d 54)

Schoharie County Jail tracks the language of our precedent by providing that a strip search may be conducted only "[w]here an officer has made a determination that there is reasonable suspicion to believe that the inmate should be searched" or "[w]here an officer has reasonable suspicion to believe an inmate is hiding contraband on his person and/or the inmate is in possession of contraband." There is to be no touching of the body unless the inmate fails to "cooperate" in the search. A much higher standard is required for body cavity searches: "[c]ompelling reasons to believe that ... contraband ... constitut[ing] a clear threat to the safety and security of the facility" is concealed in a body cavity. The version of events at the Schoharie County Jail described by the plaintiffs do not describe a body cavity search, and Sheriff Bates has indicated that no such searches have been conducted at the jail during his tenure as Sheriff.

Various terms are used to describe the inspection of a naked body, and the terms are distinguished by the degrees of intrusion involved in the search for contraband. The term "strip search" is used generally to describe any inspection of the naked body. See *N.G. v. Connecticut,* 382 F.3d 225, 228 n. 4 (2d Cir.2003). An individual being strip searched may be required to move his body in various ways to permit a more complete inspection. *Id.* A "visual body-cavity search" is a strip search that entails the specific examination of the genitals and anus, without any bodily contact by the inspector. *Id.* Finally, a "manual body-cavity search" is a strip search that involves a naked body examination, including a viewing of the genitals and anus, by touching or probing with an instrument. *Id.*

IV. Of the Clothing Exchange at the Schoharie County Jail

[5] For purposes of this appeal, we accept the plaintiffs' description of the **63** clothing exchange procedure, although the procedure they describe appears to deviate in certain respects from the protocol purportedly established by the defendants.[FN2] See *Salim,* 93 F.3d at 90. We therefore proceed, taking the facts in the light most favorable to plaintiffs, to examine the constitutional question presented. See *Pearson,* 129 S.Ct. at 818.

FN2. Although the dissent, in several places, accuses us of having accepted the defendants'

version of the facts, that is not so. Most of the half dozen plaintiffs' "facts" that the dissent claims we ignore are expressly considered in this opinion, as the reader can confirm. Moreover, the third "fact" identified by the dissent-that Kelsey had to walk naked to obtain his prison uniform-is a distortion of the record. Kelsey testified that he "reached over" and "grabbed the ... uniform," not that he "walk[ed] naked to obtain the uniform." It is undisputed that the plaintiffs were not entirely deprived of the means for protecting their modesty.

We first observe that the plaintiffs make no claim that they were subjected to visual or manual body cavity searches. Plaintiff Kelsey testified that a corrections officer stood in front of him during the brief period when he removed his street clothes and put on the jail uniform. Kelsey testified that he "assume[d]" that the officer "saw [his] genitals" during that time. Kelsey was not asked to manipulate his body in any way or to assume any particular position. Nor was he prevented from protecting his privacy by turning away from the officer as he undressed, by concealing the lower half of his body behind the half-wall in front of which he was standing, or by using the towel that was available to him during the clothing exchange. In any event, briefly "seeing" a man's genitals during a clothing exchange does not amount to a strip search.[FN3]

FN3. The dissent argues that "any statement by the majority about the constitutionality of forcing arrestees to strip is dicta." This ignores the entire basis of this lawsuit, which attacks a policy that (on plaintiffs' version of the facts) compels arrestees to remove all of their clothing in the presence of a watchful officer in preparation for showering and changing into prison attire. We assume, as we must, that inmates are required to remove their clothing in the presence of an officer. We nonetheless hold that the clothing exchange process, as described by plaintiffs, was not an unreasonable search under the Fourth Amendment.

Plaintiff Wright's characterization of the clothing exchange as a search is even more attenuated. According to Wright, the clothing exchange took place in a holding

567 F.3d 54
(Cite as: 567 F.3d 54)

cell, where he disrobed in one minute as a corrections officer stood in front of him. Wright testified that he undressed "[a]t somewhat of an angle" to the officer but could not "recall 100 percent which way [he] was facing." As best he could describe it, "[it] was like sort of facing toward the officer." Apparently, a towel was available to him as he disrobed, and he took the towel with him as he went to take a shower before returning to the holding cell with the towel. Back in the cell, he dressed in the jail uniform. According to Wright's version of events, no officer was present when he put on the jail uniform. Also, as with Kelsey, Wright was not required to move or display his body in any particular way.

Corrections Officer Kenyon, who supported the testimony of plaintiff Wright, at least to the extent of indicating that the clothing exchange took place in a holding cell (rather than behind the half-wall), declared that "the purpose of the clothing exchange process, as far as I know, is simply to get inmates into the jail uniform and secure their street clothing."[FN4] Nevertheless,*64 a necessary function of any corrections officer is to observe inmates at all times, whether the inmate is eating, sleeping, showering, undertaking recreational activity or engaging in any other activity within the confines of any jail.

FN4. Contrary to the dissent's reading of our opinion, this does not suggest that the subjective intent of the corrections officers is to be considered. It supports only the fact that the corrections officers were charged with effectuating a clothing exchange.

We conclude that the incidental observation of the body of an arrestee during a required clothing exchange, in the manner described by plaintiffs, is not an unreasonable search under the Fourth Amendment. Moreover, it seems to us that a clothing exchange observed by corrections officers under the circumstances described by plaintiffs is related to "maintaining institutional security and preserving internal order and discipline[,] essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The objectives served by a clothing exchange, according to Sheriff Bates, include assurance that each inmate has clothing that is

clean and free of infestation; that inmates are clearly identifiable and distinguishable from visitors, staff and members of the public; and that a positive state of mind be instilled in each inmate.

In assessing the need to promote the foregoing interests, we recognize that we owe "substantial deference to the professional judgment of prison administrators" such as Sheriff Bates. *See Overton v. Bazzetta,* 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). A clothing exchange is a common practice in jails and prisons as is the need for corrections officers to be vigilant at all times. *See, e.g., Marriott,* 227 F.R.D. at 169-70; *Williams,* 2008 WL 4501918, at *2; *see also Barber v. Overton,* 496 F.3d 449, 463 (6th Cir.2007) (Cook, *J.,* concurring) ("Corrections officers must be ever vigilant of constant, and often innovative, threats to their safety ...." (citation omitted)). "Legitimate goals and policies of the penal institution" support clothing exchanges at jail intakes as well as the watchful gaze of corrections officers over inmates, whether they are clothed or not.[FN5] *Bell,* 441 U.S. at 546, 99 S.Ct. 1861.

FN5. The dissent contends that our consideration of penological interests is inconsistent with our holding that the clothing exchange procedure did not constitute a Fourth Amendment search. However, that a court must examine penological interests if a constitutional right is implicated does not mean that a court is *precluded* from considering them in other circumstances.

The dissent points out that inmates are afforded privacy when they shower and change into prison attire during the clothing exchange process. From this the dissent infers that defendants have "rejected" the idea that the presence of officers when inmates remove their street clothes furthers security, order, and discipline in the jail. This inference is strained at best; and in any event, it is not for us to decide when officers should be permitted to observe inmates as they go about activities of daily life in jail, or specify (under the Constitution) times when inmates may not be watched. As the dissent observes, the Schoharie County Jail is a "controlled environment," in which inmates have a limited expectation of privacy and freedom of movement. While we have an obligation to set a floor of constitutionality permissible conduct, we are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

ill-equipped to define the contours of life in jail.

The District Court framed the issue thus: "[I]f a CO w[ere] required to observe an inmate undress, would this procedure constitute an unreasonable search under the Fourth Amendment to the United States Constitution?" *Kelsey,* 2007 WL 603406, at *5. Our answer to this question **\*65** is that such a procedure is not *per se* an unreasonable search violative of the Fourth Amendment. In giving this answer, we do not depart from, or erode in anyway, our "clearly established" precedent "that persons charged with a misdemeanor and remanded to a local correctional facility ... have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons...." *Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001); *see also N.G. v. Connecticut,* 382 F.3d 225 (2d Cir.2004) (stating that this Court has ruled in several decisions that "strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband" (citing *Shain,* 273 F.3d at 62-66; *Wachtler v. County of Herkimer,* 35 F.3d 77, 81 (2d Cir.1994); *Walsh v. Franco,* 849 F.2d 66, 68-69 (2d Cir.1988); *Weber,* 804 F.2d at 802)). Our precedents do not control the allegations in this case.

We hold here only that a process for the exchange of personal clothing for prison clothing under the observation of a corrections officer in the manner described by plaintiffs does not implicate the type of privacy protected by the Fourth Amendment nor does it fall within the prohibitions established by our precedents relating to strip searches. Plaintiffs were not required to display or manipulate their body parts in any way. Moreover, Plaintiffs did not deny that methods were available to them to protect viewing of their private parts in the event they desired to make use of such methods.

V. Conclusion

Because the plaintiffs have been unable to identify any constitutional violation on the parts of the individual defendants, the Decision and Order of the District Court is reversed, and the case is remanded with instructions to dismiss the action as against the individual defendants. Because the plaintiffs lack any underlying claim of a

deprivation of a constitutional right, the claim of municipal liability on the part of defendant County of Schoharie is to be dismissed as well. See *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995).

Judge SOTOMAYOR dissents in a separate opinion.
I dissent because the majority has exercised jurisdiction where it has none and assumed the wrong party's version of the facts. It has also offered dicta that contradicts this Circuit's precedent and disregards the experienced judgment of jail administrators. Under a correct analysis of this case, we would be presented with the following question: During the relevant time period, did our clearly established precedent interpreting the Fourth Amendment permit arrestees for misdemeanors to be forced to expose their private parts to corrections officers ("COs") and inmates without reasonable suspicion? The answer is "no." Accordingly, the judgment of the district court should be affirmed.

Because we are reviewing, on interlocutory appeal, a denial of summary judgment on the ground of qualified immunity, our jurisdiction is limited in two key ways. First, we cannot assert jurisdiction over a question of evidence sufficiency. *Salim v. Proulx,* 93 F.3d 86, 91 (2d Cir.1996) ("What we may not do ... is entertain an interlocutory appeal in which a defendant contends that the district court committed an error of law in ruling that the plaintiff's evidence was sufficient to create a jury issue on the facts relevant to the defendant's immunity defense."). Second, we may only assert jurisdiction over this interlocutory appeal if we use the "undisputed facts or plaintiff's version of the facts." **\*66** *Coons v. Casabella,* 284 F.3d 437, 440 (2d Cir.2002) (internal quotation marks omitted). The majority violates both principles: it dismisses the district court's finding regarding the sufficiency of plaintiffs' evidence, and it adopts defendants' version of the facts.

The district court found that there existed "issue[s] of material fact as to whether [the jail]'s policies and practices require COs to observe inmates as they remove their street clothes" in what may have amounted to a "strip search process." *Kelsey v. County of Schoharie,* No. 04-cv-299, 2007 WL 603406, at *5 (N.D.N.Y. Feb.21, 2007). Rejecting the district court's finding, the majority re-evaluates the record and concludes that "[p]laintiffs

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

were not required to display ... their body parts in any way" and that "methods were available to the[ plaintiffs] to protect viewing of their private parts in the event they desired to make use of such methods." Maj. Op. at 65. The majority never explains how it has the authority to re-weigh the sufficiency of the evidence and conclude that there is no dispute regarding a material fact. Our precedent is clear that "[i]n an interlocutory appeal of a qualified immunity claim, where the parties dispute material facts, the issue of whether there is sufficient evidence to support plaintiff's version of the material facts is within the province of the district court." *Holeman v. City of New London,* 425 F.3d 184, 192 (2d Cir.2005); *see also Martinez v. Simonetti,* 202 F.3d 625, 632 (2d Cir.2000) ("[I]mmediate appeal is not permitted if the district court's denial of summary judgment for qualified immunity rests on a finding that there were material facts in dispute ...." (internal quotation marks omitted)).

The majority avoids acknowledging its usurpation of the district court's jurisdiction by purporting to conduct an analysis based on plaintiffs' version of the facts. Maj. Op. at 63-64. Yet plaintiffs Kelsey and Wright have alleged that, after being arrested, respectively, for violating a child support order and driving while intoxicated, they were forced to strip naked and be inspected by corrections officers. (*See* Compl. ¶¶ 32-36, 40-43; Dep. of John Kelsey 75:22-76:2 ("I was humiliated.... I had another officer strip me down and, you know, staring at me when I was naked."); Dep. of Timothy E. Wright 134:10-13 ("[I]t was, you know, just a rather humiliating kind of-shameful kind of, just being naked in front of at least one other individual and possibly in the view of others.").) Contrary to these allegations, the majority implausibly concludes that Kelsey and Wright volunteered to strip naked and expose their private parts to corrections officers and others, despite several opportunities to guard their privacy. *See* Maj. Op. at 65. In so concluding, the majority is adopting defendants'-not plaintiffs'-version of the facts. (*See* Appellants' Br. at 2 ("This case specifically concerns a procedure ... that requires inmates to change out of their street clothes and into a facility-issued uniform with partial privacy but in the physical presence of a corrections officer.").)

The majority justifies its approach by excerpting portions of plaintiffs' deposition testimony. For example, the majority emphasizes Kelsey's responses to questions from

defendants' counsel to the effect that, during his disrobing, no one prevented him from turning around, hiding behind a half-wall in the booking area, or somehow covering himself with a towel or mesh bag while removing all of his clothes. Maj. Op. at 58, 63 These statements, however, cannot be understood in isolation. Kelsey, according to his own testimony, did not recall having a towel at his disposal when he was removing his clothing. Nonetheless, the majority assumes that a towel *67 was "available" to Kelsey during his disrobing. Maj. Op. at 63.

The majority overlooks or discounts other key details in the deposition testimony of Kelsey and Wright that undermine the majority's conclusion that plaintiffs, by their own admission, could have protected their privacy by turning their backs to the CO,[FN1] wrapping themselves in a towel or hiding behind a half-wall in the booking area. First, the majority acknowledges but then disregards that one of the COs who may have observed Wright testified that arrestees were "required to stand in front of him and face him during the entire clothing exchange," and that the exchange did not take place near the half-wall or provide the "option to disrobe in private." Maj. Op. at 59. Second, the majority simply ignores that Kelsey testified that he was forced to disrobe in full view of a holding cell that contained an inmate, who was standing and laughing at Kelsey. It is questionable whether Kelsey could have avoided the eyes of the CO as well as those of the inmate. Third, the majority dismisses Kelsey's testimony that, because the jail uniform into which he was supposed to change was located on a bench outside of his reach, he had to walk while naked to obtain the uniform.[FN2] Under those circumstances, it is unclear how Kelsey could have maintained his privacy behind a wall. Fourth, Wright testified that he was forced to strip inside of, or immediately at the gate of, a holding cell, in front of which stood a CO. During his deposition, one of the COs confirmed that he conducted clothing exchanges in the holding cell with the arrestee. In order to change behind the half-wall, Wright would have been required to walk away from the holding cell and past the CO. Fifth, although the majority notes that Kelsey and Wright testified that a CO stood in front of them while they were changing, the majority does not fully consider the fact that, according to both parties, the CO was holding the bag into which plaintiffs had to deposit their clothes as they removed them. This would have made it nearly impossible for either arrestee to turn his back to the CO and successfully deposit his clothes in the bag.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

FN1. Despite the majority's assumption, it is not clear that an individual's privacy interests would be preserved if he were forced to expose his naked backside to a CO.

FN2. Kelsey testified that, in order to reach the bench, "I had to move. I don't know exactly how many steps."

Finally, the majority assumes that the obligatory stripping occurred amidst free-spirited dialogue between jail guards and arrestees, instead of (as defendants acknowledge) in a "controlled environment," which both Kelsey and Wright described as "[h]umiliating." In the one instance when Kelsey (who worked as a corrections officer at another jail) questioned the CO regarding the disrobing procedure, Kelsey was informed that he had no other option. FN3

FN3. Kelsey testified as follows: "I had asked him [the C.O.], 'Do I have to [do] this here?' 'Do I have to get changed here,' and he said 'Yes, you do.' "

The majority compounds its errors involving jurisdiction and standard-of-review by offering dicta that contradicts this Circuit's precedent. Although concluding that "methods were available to the[ plaintiffs] to protect any viewing of their private parts," Maj. Op. at 65, the majority nonetheless suggests that the disrobing procedure would be constitutional because "briefly 'seeing' a man's genitals during a clothing exchange does not amount to a strip search." Maj. Op. at 63. Then the majority seems to retreat from this statement **68 when it writes, "[w]e hold here only that a process for the exchange of personal clothing for prison clothing under the observation of a corrections officer in the manner described by plaintiffs does not implicate the type of privacy protected by the Fourth Amendment." Maj. Op. at 65. In fact, as discussed, the majority has accepted defendants' version of the facts and concluded that plaintiffs in this case were not required to expose themselves. Accordingly, any statement by the majority about the constitutionality of forcing arrestees to strip naked is dicta.

It is, however, puzzling dicta, given this Circuit's precedent on strip searches. *See, e.g., Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001) ( "[P]ersons charged with a misdemeanor and remanded to a local correctional facility ... have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons...."); *Walsh v. Franco,* 849 F.2d 66, 69 (2d Cir.1988) ("[T]he unconstitutionality of a blanket policy calling for strip searches of all misdemeanor arrestees was clearly established."). Without explanation, the majority dismisses this Circuit's precedent on strip searches as not "control[ling] the allegations in this case." Maj. Op. at 65. From the majority's opinion, one can infer two possible reasons for the majority's summary statement, neither of which is valid under Fourth Amendment jurisprudence.

First, insofar as the majority suggests that "brief[ ]" exposure of one's private parts does not implicate the Fourth Amendment, Maj. Op. at 63, our precedent does not support the notion that a search need be prolonged or thorough to be termed a "strip search." *See N.G. v. Connecticut,* 382 F.3d 225, 228 n. 4 (2d Cir.2004) (" 'Strip search' is often used as an umbrella term that applies to all inspections of naked individuals.").

Second, the majority seems to suggest that the disrobing procedure at issue in this case "does not implicate the type of privacy protected by the Fourth Amendment" (Maj. Op. at 65) and is distinguishable from traditional strip searches of persons charged with misdemeanors because of the motives of the officers conducting the procedure. *See* Maj. Op. at 64 (describing (1) CO's testimony that purpose of strip procedure was merely to exchange clothes, and (2) observation of arrestee's body as "incidental" to "clothing exchange"). FN4 But the privacy interests protected by the Fourth Amendment do not become irrelevant merely because we use the nomenclature of "clothing exchange" instead of "strip search." *See Marriott v. County of Montgomery,* 227 F.R.D. 159, 169 (N.D.N.Y.2005) ("Using different terminology, such as change-out, does not change the observation of a naked admittee to anything other than what it is-a strip search."). As the Supreme Court has explained with respect to the act of urination (whose visual or aural monitoring "implicates privacy interests"), "[t]here are few activities in our society more

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

personal or private.... Most people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as by social custom." *69 *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (internal quotation marks omitted). This rationale applies equally strongly to the exposure of one's private parts. *See Justice v. City of Peachtree City,* 961 F.2d 188, 191 (11th Cir.1992) ("Deeply imbedded in our culture is the belief that people have a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have their 'private' parts observed or touched by others." (internal quotation marks and alterations omitted)); *cf. Forts v. Ward,* 621 F.2d 1210, 1217 (2d Cir.1980) ("The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex.").

> FN4. To the extent that the majority is suggesting that the exact same procedure may or may not amount to an invasion of privacy depending upon the CO's subjective intent, this is improper because "challenged searches are judged 'without regard to the underlying intent or motivation of the officers involved.' " *Hudson v. New York City,* 271 F.3d 62, 68 (2d Cir.2001) (quoting *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).

Moreover, in analyzing the purpose of the disrobing procedure, the majority again commits the fallacy of adopting defendants' version of disputed facts. Defendants have represented to this Court that the purpose of the procedure is "incidental observation of the inmate where the intent is not to search, but to perform an administrative action in a controlled environment." (Reply Br. for Appellants at 21.) They have also asserted that the procedure is "not intended to be a personal search." (Appellants' Br. at 6.) The majority agrees. It writes of the "incidental observation of the body of an arrestee." Maj. Op. at 64. In contrast, plaintiffs allege that the objective of the disrobing procedure is to search arrestees (*see* Appellees' Br. at 2) and, according to the district court, the record "strongly suggest[ed]," but did not establish, "that the purpose behind the entire exchange/strip search process is to search inmates for contraband." *Kelsey,* 2007

WL 603406, at *6. If the majority accepted-as it must on this interlocutory appeal-plaintiffs' version of the facts, then it would be compelled to call this procedure what plaintiffs allege it to be: a "strip search."

Having erroneously concluded that the Fourth Amendment is not implicated, the majority nonetheless proceeds to argue that the disputed procedure is constitutionally valid because it is "related to 'maintaining institutional security and preserving internal order and discipline.' " Maj. Op. at 64 (quoting *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). But a court need only examine penological objectives *if* a constitutional right is implicated. *See Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."). Accordingly, the majority's analysis belies its conclusion: the majority's evaluation of penological objectives is necessary only if-contrary to the majority's conclusion-the disrobing procedure implicates the type of privacy interests protected by the Fourth Amendment.[FN5]

> FN5. The majority responds that, regardless of whether a constitutional right is implicated, nothing prevents it from considering penological interests "in other circumstances." Maj. Op. at 64 n. 5. But the majority fails to explain what "other circumstances" justify its analysis or how its discussion is relevant to its holding.

Nonetheless, it is true that with respect to jails, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell,* 441 U.S. at 546, 99 S.Ct. 1861. But the majority, after implicitly conceding that the disrobing procedure implicates the Fourth Amendment, invokes penological objectives that defendants have rejected and fails to *70 identify essential goals requiring the retraction of Fourth Amendment rights. Although recognizing that it is "ill-equipped to define the contours of life in jail," Maj. Op. at 64, the majority nonetheless "substitute[s] [the Court's] judgment on these difficult and sensitive matters of institutional administration and security for that of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)

persons who are actually charged with and trained in the running of such facilities." *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (internal quotation marks and citations omitted). For example, the majority suggests that the clothing procedure is justified in order to ensure: (1) "that each inmate has clothing that is clean and free of infestation;" (2) "that inmates are clearly identifiable and distinguishable from visitors, staff and members of the public;" and (3) "that a positive state of mind be instilled in each inmate." Maj. Op. at 64. But no one is challenging a jail's authority to require detainees to wear uniforms, and none of these reasons justify requiring an arrestee to strip in front of a CO. *See Bell,* 441 U.S. at 559, 99 S.Ct. 1861 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); *Weber v. Dell,* 804 F.2d 796, 804 (2d Cir.1986) ("Deference, however, is not a dispensation from the requirement under the Fourth Amendment that searches be reasonable."). Jail administrators have adopted means-other than clothing exchanges-of detecting contraband. In particular, the jail policy (which does not reference clothing exchanges) allows pat searches and searches with a hand-held metal detector upon intake, and it permits strip searches and body cavity searches upon "reasonable suspicion to believe that the inmate should be searched."

The majority also suggests that forcing arrestees to strip naked is justified because COs must "observe inmates at all times." Maj. Op. at 64. But defendants never claim that COs must be omnipercipient. Defendants deny the existence of any blanket jail policy of requiring arrestees to expose themselves. (*See* Appellants' Br. at 2 ("This case specifically concerns a procedure ... that requires inmates to change out of their street clothes and into a facility-issued uniform with partial privacy but in the physical presence of a corrections officer.").) According to defendants, arrestees are permitted to change behind a half-wall and are informed by COs that they may use a towel for privacy. They further acknowledge that COs do not watch the arrestees showering or changing into their jail uniforms. Defendants do not, therefore, argue that COs must exercise unflagging and perpetual vigilance over every pore of an arrestee's body. Nor, in contrast to the majority, do defendants suggest that some degree of privacy is necessarily anathema to a jail's internal order or that the forced exposure of private parts during a clothing exchange is an integral part of jail security. Accordingly,

where defendants, themselves, have conceded that penological interests are satisfied in a manner that does not require the forced exposure of private parts, we should not condone an alleged infringement upon constitutionally protected privacy interests merely because we can imagine an alternative procedure that we might consider to be more effective.

I agree with the majority that it is important for corrections officers to be vigilant and that clothing exchanges can serve important objectives. Maj. Op. at 64. But like the First Circuit and in the absence of reasonable suspicion:

[o]ur case law on misdemeanor arrestees effectively holds that, even if the only way to be comprehensive in detecting **71 contraband is to perform a strip search, the government must bear the risk of missing some items.... [B]alancing constitutional rights and institutional needs may require that, in situations presenting only a remote risk of concealment, we accept less than perfect law enforcement procedures.

*Wood v. Hancock County Sheriff's Dep't,* 354 F.3d 57, 65 n. 13 (1st Cir.2003); *see N. G.,* 382 F.3d at 232 ("[I]n several decisions, we have ruled that strip searches may not be performed upon adults confined after arrest for misdemeanors, in the absence of reasonable suspicion concerning possession of contraband."). If, under plaintiffs' version of the facts, arrestees for misdemeanors could have protected their private parts from exposure, I would have agreed with the majority that Fourth Amendment interests would not be implicated and violated. But that is not the case before us.

Because plaintiffs' version of the facts indicates a constitutional violation of a clearly established right under the Fourth Amendment against unreasonable searches, we should affirm the district court's denial of summary judgment.

C.A.2 (N.Y.),2009.
Kelsey v. County of Schoharie
567 F.3d 54

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

567 F.3d 54
(Cite as: 567 F.3d 54)


END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.